## A98A1494. ODEM v. PACE ACADEMY.
(510 SE2d 326)

POPE, Presiding Judge.

Appellant Jeffrey L. Odem appeals from the trial court's grant of summary judgment to Pace Academy on his claims for breach of contract, intentional infliction of emotional distress and breach of a legal duty arising out of the termination of his employment at Pace. We affirm.

"To prevail at summary judgment under OCGA § 9-11-56, the moving party must demonstrate that there is no genuine issue of material fact and that the undisputed facts, viewed in the light most favorable to the nonmoving party, warrant judgment as a matter of law. OCGA § 9-11-56 (c). A *defendant* may do this by showing the court that the documents, affidavits, depositions and other evidence in the record reveal that there is no evidence sufficient to create a jury issue on at least one essential element of plaintiff's case." (Emphasis in original.) *Lau's Corp. v. Haskins*, 261 Ga. 491 (405 SE2d 474) (1991). On appeal from a grant of summary judgment, this Court conducts a de novo review of the record, construing the evidence and all inferences therefrom in favor of the nonmoving party. *Maddox v. Southern Engineering Co.*, 231 Ga. App. 802, 803 (500 SE2d 591) (1998); *Lane v. Spragg*, 224 Ga. App. 606 (481 SE2d 592) (1997).

The record shows that from August 1992 to January 25, 1994, Odem was employed as the technical director of Pace's theater program. Odem's responsibilities included coordinating the scenery for the school's theater productions and teaching classes on the technical aspects of theatrical productions.

Odem originally was hired for the 1992-1993 school year and signed a one-year contract. Although George Mengert, the head of Pace's drama department and Odem's immediate supervisor, stated he had some concerns about Odem's organizational skills, Odem's contract was renewed for another year in February 1993.

Odem's contract with Pace provided that it was terminable at will by either party upon 30 days written notice. In addition, Pace retained the right at any time "to annul this contract, suspending without compensation or dismissing the teacher for unsatisfactory professional performance, insubordination, neglect of duty, the violation of any law, or failure to adhere to the terms of this contract or to standards of personal conduct consistent with the philosophy of the school." The contract further provided that implicit within its terms was "the understanding that employees are expected to comply with written, stated, and commonly understood definitions of duties and responsibilities in the discharge of school responsibilities." In conjunction with his employment, Odem received a copy of the school's

faculty handbook. He read the handbook and understood that he had to abide by its policies.

In November 1993, during preparations for the school's fall musical "Carousel," work on the stage sets ran behind schedule,[1] and the school hired a carpenter to help Odem complete the work. Even with the additional help, Odem and his technical staff were still working on the sets on opening night. Under the time pressure of these preparations, tempers flared and Odem developed an acrimonious relationship with Jill Cadenhead, one of the parent volunteers working on the production. In the midst of this pre-production work, Odem was informed that a female student was upset and crying because an adult male dancer hired by the school had been touching the student's breasts during dance rehearsals. Odem called the girl to his office, and she confirmed this story. Odem told her that she did not have to tolerate the dancer's conduct, that she should tell the dancer to stop his behavior and that she should tell the dancer that she had told an adult about his actions. Several days later, at a post-production party Odem informed the student's parents of the situation.

The next day, Odem learned from a second female student that two years earlier, the same male dancer had touched her inappropriately during another Pace musical production. The girl told Odem that she had reported the dancer's actions at the time to Cadenhead, who had also volunteered on the earlier production, but that Cadenhead had told her something to the effect of "grow up" and had taken no action. The girl from whom Odem had first heard of the inappropriate incident later told Odem that she had also spoken with Cadenhead about the dancer's conduct, with similar results.

During one of the last performances of Carousel, Odem received information that Cadenhead was asking for help from another volunteer in getting Odem fired. Odem responded to this information by saying that he was quitting and leaving the backstage area. Nevertheless, Odem immediately "thought better" of it and returned to the set.

On the first school day after the Carousel production, Odem reported the girls' accounts of the dancer's behavior to George Kirkpatrick, Pace's headmaster. Kirkpatrick told Odem that he had done the right thing in reporting these incidents.[2] Kirkpatrick also told Odem that the school would investigate the situation and instructed

---

[1] The record contains evidence indicating that the absence of other staff members due to illness may have contributed to these delays.

[2] But George Mengert, Odem's immediate supervisor, later told Odem that he wished he knew who had reported the matter because he did not like to be connected with such events.

him not to discuss the matter with the girls' parents. But Odem had already spoken with the first student's parents and, despite Kirkpatrick's instructions, later discussed the matter with the second girl's parents and at least one other school parent. And when Odem later learned that a third girl may also have been inappropriately touched by the male dancer in the earlier production, he discussed the matter with that girl's mother. Odem then reported this third incident to Kirkpatrick.

In the meantime, Cadenhead and other volunteers began complaining to Odem's supervisor, Mengert, about Odem's behavior during the Carousel production. In a letter, one volunteer complained about Odem's lack of organizational and teaching skills and emphasized his temper and "mercurial mood swings," stating that she had seen him "blow up" at students and have "temper tantrums" before "storming" out of class. This volunteer recalled that Odem had even thrown wood across the shop during one "outburst." Cadenhead also wrote a letter raising similar concerns, noting one instance when she said Odem had scared several young children who had been enlisted on the Carousel production.

Around this time, the school also received a report that Odem kept a gun in his unlocked truck while it was parked at school. This report, from a carpenter who was helping with Carousel, indicated that the gun was lying in Odem's truck on the front seat under some magazines. The carpenter also reported that Odem had made a comment during production to the effect that he sometimes felt like a postal worker and he could just go in and blow everyone away.[3]

Mengert related these matters to Headmaster Kirkpatrick and spoke with Odem about his gun. Odem admitted that he brought his gun to school every day and stated that it was his constitutional right to do so. Kirkpatrick told him never to bring the gun on campus again, and after further discussion Odem agreed.

By this time, the school had completed its investigation of the reported incidents with the girls, and Kirkpatrick determined that no further action was warranted. Moreover, Kirkpatrick understood that the individuals involved wanted the matter dropped without further reporting to authorities.

During December 1993 and January 1994, Odem stated that he became concerned about the school's decision not to report the incidents to the proper authorities and about whether these events were affecting his employment prospects. Odem began discussing the matter, including the incidents involving the girls, with parents, trust-

---

[3] Odem testified on deposition that he never made any threats to the school, but merely said that he understood how events involving postal workers shooting fellow employees could happen.

ees, and faculty members, and sought advice on how to resolve these issues with the school administration. In these discussions Odem did not volunteer the girls' names but did tell several trustees after they asked him to do so. Odem also discussed the situation with students when they asked, but stated that he only mentioned the girls by name if the student already knew the girls' identities.

After the school began receiving complaints from trustees and other reports of Odem's discussions, school officials told Odem to stop calling the trustees and to refrain from discussing the matter with students, faculty and parents. Despite this directive, Odem continued to call the trustees, although he says that he did stop talking to other faculty and parents. Odem also informed the school that he had been talking to a lawyer about his and the school's duties under the law to report the incidents involving the girls.

These events culminated in a meeting on January 18, 1994, when Kirkpatrick informed Odem that the school had decided not to renew his contract at the regular renewal time in February, but instead to place him on probation. Odem was given a list of requirements for his probationary status and asked to sign off on them. The list included directives that he would not bring a gun onto campus; that he would not discuss his "situation" with trustees, students, Pace employees or members of the public; that he would not talk to the female students or their parents about the "situation"; that he would not sue the school; and also included a list of professional requirements. Odem was given two days to respond to the school's probation proposal.

Two days later, after consulting with an attorney,[4] Odem informed the school that he would not sign the list of probationary requirements and offered a counterproposal. In his counterproposal, Odem agreed that he would not bring a gun on campus, asked for a favorable letter of recommendation and offered to cease discussing the incidents involving the female students if the school would agree to sign a mutual release as to all claims arising out of the "alleged misconduct of the visiting artist." The school had not formally responded to Odem's counterproposal by the end of that week and expected Odem to appear for work the following Monday.

The events of the following week are in some dispute. Pace officials testified that Odem did not report for work or conduct his classes the following Monday, January 24, or Tuesday, January 25. In fact, Kirkpatrick stated that he had received reports that Odem had indicated that he would resign. Odem testified that he did

---

[4] Odem also discussed the list of probationary requirements and his employment situation with some of his students.

appear for work those two days and that he "probably" conducted his classes on January 24, and that he did not tell anyone he was resigning. However, Odem did not dispute that he failed to show up to teach his class or to secure a substitute teacher for the class on January 25. Instead, he went to the police department to file a report on the incidents involving the male dancer and the three girls.

After Kirkpatrick learned that Odem had gone to the police department to make a report,[5] he sent Odem a letter stating that as of January 25, 1994, he was dismissed as an employee of Pace and that his contract was annulled for unsatisfactory professional performance and insubordination. The letter notes that the school had received a report that Odem had said he was resigning and that the school was taking his failure to show up for his January 25 class as proof of his resignation.

1. Odem contends that the trial court erred in granting summary judgment on his breach of contract claim because Pace did not terminate him for cause under his contract. Instead, Odem states that he was fired because he kept discussing the school's failure to report the dancer's inappropriate conduct and eventually reported the conduct himself.

"In summary judgments involving contract cases, the construction of a contract is a question of law for the trial court where the language of a contract is clear and unambiguous and capable of only one reasonable interpretation as applied to the subject matter. The cardinal rule of contract construction is to ascertain the intention of the parties. Where the intent of the parties is clear and unambiguous, the court will look to the contract alone to determine the parties' intent." (Citations and punctuation omitted.) *Amstadter v. Liberty Healthcare Corp.*, 233 Ga. App. 240, 242 (1) (503 SE2d 877) (1998).

Odem's employment contract stated explicit grounds for the termination of his employment without notice. At the time of his termination, the school cited two of these grounds: unsatisfactory professional performance and insubordination. Kirkpatrick's letter noted in particular the report the school received that Odem was resigning and his failure to appear for his January 25 class. The Pace faculty handbook requires that its teachers attend their classes, notify the school of any absences and secure a substitute teacher if they plan to be absent. When Odem failed to take any of these steps, the school

---

[5] Kirkpatrick testified at his deposition that he knew that Odem had filed a police report before he terminated him. Although he later submitted an affidavit stating that he did not know of the police report at the time of Odem's dismissal, for purposes of summary judgment we must construe this conflicting testimony against Pace as Kirkpatrick offered no explanation for his change of position. *Prophecy Corp. v. Charles Rossignol, Inc.*, 256 Ga. 27, 30 (343 SE2d 680) (1986).

interpreted his actions as abandonment of his position and sent the letter of dismissal. Odem's failure to abide by the school's written policies certainly could be construed as unsatisfactory professional performance under the contract justifying the termination.

Moreover, Odem admitted to acts of insubordination. After Kirkpatrick directed Odem not to discuss the incidents with the girls' parents, Odem admits that he did speak, not only with two of the girls' parents, but also to at least one other school parent. Similarly, he admits that he continued to discuss these matters with the school's trustees after being directed not to do so. Thus, Odem admits that he disobeyed direct instructions from the head of the school. Further, in discussing these incidents with other students (mentioning the students involved by name with some students), faculty members, and parents not directly involved, Odem violated written school policies advising caution when discussing students and prohibiting a teacher from discussing a student with other students or the parents of other students.

Additionally, Odem admitted to keeping a gun in his car when he came to school. Georgia law makes it a felony to carry or possess or have under one's control a weapon on school property. OCGA § 16-11-127.1. Thus, when Odem admitted that he kept a gun in his car every day, he admitted that he violated the law. Because Odem's contract gave Pace the right to annul the contract for the violation of any law, this behavior alone provided Pace a ground for terminating Odem.

Further, at the time of Odem's termination, Pace had received complaints from parents who had worked with Odem on Carousel. These parents complained not only of Odem's organizational abilities, but also of his temper and treatment of students. While Odem denied the specific incidents related by the parents, he admitted that he had a temper, that he raised his voice around students, and that he may have used foul language in front of them. The school could have found this behavior to be unprofessional behavior.

These factors taken together provide a basis for Pace's decision to annul Odem's contract on the ground of unsatisfactory professional performance and insubordination. See *Smitherman v. Mary House Ministries*, 200 Ga. App. 116, 117 (1) (407 SE2d 58) (1991).

Nevertheless, Odem contends that Pace did not fire him for cause.[6] He argues that Pace dismissed him not for his actions in violating school policy and disobeying instructions from his superiors, but rather that he was dismissed solely in retaliation for his reports

---

[6] Odem states explicitly that he is not contending that Pace breached the implied covenant of good faith in exercising its rights under the contract, so we do not address that issue.

of child abuse to the administration and to the police (although he admits that Kirkpatrick told him that he had done the right thing in reporting the incidents to him). In support of his argument that he was fired for improper reasons, Odem relies upon cases discussing the issue of pretext under federal discrimination law. These cases which discuss discrimination and retaliation claims under federal statutory and constitutional law have no application to Odem's breach of contract claim. In the discrimination claims, proof of pretext is a defined element of the plaintiff's case. See, e.g., *Howard v. BP Oil Co.*, 32 F3d 520 (11th Cir. 1994) (racial discrimination claim under 42 USCA § 1981).[7]

However, the elements for a breach of contract claim in Georgia are merely " 'the breach and the resultant damages to the party who has the right to complain about the contract being broken.' " *Budget Rent-A-Car of Atlanta v. Webb*, 220 Ga. App. 278, 279 (1) (469 SE2d 712) (1996). In this instance where we have determined that Pace had authority under the contract to terminate Odem's employment, no breach of contract occurred and Odem's claim cannot survive summary judgment.

2. Odem also contends that the trial court erred in granting Pace summary judgment on his claim for intentional infliction of emotional distress. To succeed on this claim, Odem must establish all four of the following elements: "(1) The conduct must be intentional or reckless; (2) The conduct must be extreme and outrageous; (3) There must be a causal connection between the wrongful conduct and the emotional distress; [and] (4) The emotional distress must be severe." (Punctuation omitted.) *Hendrix v. Phillips*, 207 Ga. App. 394, 395 (1) (428 SE2d 91) (1993). "Whether a claim rises to the requisite level of outrageousness and egregiousness to sustain a claim for intentional infliction of emotional distress is a question of law." (Citation and punctuation omitted.) *Taylor v. Gelfand*, 233 Ga. App. 835, 837 (3) (505 SE2d 222) (1998).

Moreover, "[i]t has not been enough that the defendant has acted

---

[7] Similarly, the Georgia cases Odem cites are not applicable to this case where Odem disputes Pace's reasons for firing him, even though he admits to behavior which violated school policy and the law, and which violations provided Pace with explicit grounds for dismissal under his contract. See *Savannah College of Art &c. v. Nulph*, 265 Ga. 662, 663 (3) (460 SE2d 792) (1995) (holding that the trial court erred in directing a verdict in favor of employee on the basis of a procedural breach of contract and determining that the employer was entitled to have the jury consider whether it had justification for dismissing employee); *Bldg. Materials Wholesale v. Reeves*, 209 Ga. App. 361, 362-364 (1) (433 SE2d 346) (1993) (holding that trial court correctly denied a directed verdict on the issue of whether the employee had substantially complied with his employment contract where evidence showed he violated his contract by charging personal phone calls to the company on company time, but offered to reimburse the company for his expenses and attempted to make up the time taken up with calls by skipping lunch or working late).

with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by malice, or a degree of aggravation that would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." (Citation and punctuation omitted.) *Bowers v. Estep*, 204 Ga. App. 615, 618 (2) (420 SE2d 336) (1992).

We have held as a matter of law that Pace acted within its contractual rights in terminating Odem's employment, so Odem's argument that his termination was retaliatory does not support his claim for intentional infliction of emotional distress. Compare *Yarbray v. Southern Bell Tel. &c. Co.*, 261 Ga. 703, 706 (409 SE2d 835) (1991) (jury issue present as to whether plaintiff was demoted in retaliation for testifying in sexual harassment action against employer); *Trimble v. Circuit City Stores*, 220 Ga. App. 498, 500 (469 SE2d 776) (1996) (factual issue existed as to whether employer forced employee to resign in retaliation for sexual harassment claim and in so doing threatened plaintiff's physical health). We must determine whether Odem has presented evidence of any other behavior on the part of Pace that is sufficiently extreme or outrageous to survive summary judgment.

Although Odem claims that the school's efforts to keep him from discussing the incidents involving the three female students support his claims, the record shows that school officials did no more than ask Odem to abide by school policy and allow the administration to investigate and make the final decision regarding the matter. Moreover, although Odem claims that he was pressured not to report these incidents to police, in his counterproposal to Pace, Odem offered to let the matter drop and not report it to authorities. Odem can hardly claim severe emotional distress resulting from conduct to which he was willing to agree. See *Sossenko v. Michelin Tire Corp.*, 172 Ga. App. 771, 772-773 (324 SE2d 593) (1984) (warnings, job transfers, and harassment directed toward "whistleblower" do not state a claim for intentional infliction of emotional distress).

Odem further testified that Kirkpatrick was rude to him on two occasions, once when he presented the list of probationary requirements in a loud, forceful voice and the second time when he had an outburst after Odem told him that he had consulted an attorney about the list. Odem also said that at times his discussions with school employees were very emotional and intense. However, he admits that he never felt physically threatened or intimidated by anyone at Pace. Liability for intentional infliction of emotional distress does not extend to " 'mere insults, indignities, threats, annoy-

ances, petty oppressions, or other trivialities.'" *Amstadter v. Liberty Healthcare Corp.*, 233 Ga. App. at 243 (2). See *Sossenko v. Michelin Tire Corp.*, 172 Ga. App. at 772-773. Thus, Odem has failed to show any actions on the part of Pace rising to the requisite level of outrageousness or egregiousness.

Moreover, Odem has failed to present evidence of any severe emotional distress resulting from these events. While Odem filed an affidavit in opposition to Pace's motion for summary judgment in which he states that he suffered stress, humiliation, embarassment and worry, he testified on deposition only that he had experienced financial difficulties and that when he consulted his physician for nasal congestion the doctor had discovered "accidentally" that Odem's blood pressure was "marginally high." Odem also testified that he sought no professional advice from doctors or counselors and discussed the matter only informally with his minister. However, "[t]he law intervenes only where the distress inflicted is so severe that no reasonable man could be expected to endure it." (Citation, punctuation and emphasis omitted.) *Peoples v. Guthrie*, 199 Ga. App. 119, 121-122 (2) (404 SE2d 442) (1991).

Accordingly, we hold that the trial court was correct in granting summary judgment on Odem's claim of intentional infliction of emotional distress.

3. Additionally, Odem contends that the trial court erred in granting summary judgment on his claims under OCGA §§ 51-1-6 and 51-1-8. OCGA § 51-1-6 provides that "[w]hen the law requires a person to perform an act for the benefit of another or to refrain from doing an act which may injure another, although no cause of action is given in express terms, the injured party may recover for the breach of such legal duty if he suffers damage thereby." OCGA § 51-1-8 states that "[p]rivate duties may arise from statute or from relations created by contract, express or implied" and holds that "[t]he violation of [such a] duty, accompanied by damage, shall give a right of action." Odem bases his claims under these provisions on Pace's failure to report the incidents involving the three students to outside authorities under Georgia's child abuse reporting law, OCGA § 19-7-5.

This Court has previously held that no private cause of action lies for a failure to report child abuse in accordance with OCGA § 19-7-5. *Vance v. T. R. C.*, 229 Ga. App. 608, 610 (1) (a) (494 SE2d 714) (1997); *Cechman v. Travis*, 202 Ga. App. 255, 256 (1) (414 SE2d 282) (1991). Odem argues, however, that these statutes create a derivative cause of action in his favor. Odem contends that he and Pace had a duty to report the incidents involving the three female students and that Pace therefore could not retaliate against Odem for reporting the abuse to authorities. Odem further argues that because Pace

violated its duty to report these incidents, he has a cause of action to recover for damages.

In determining whether the violation of a statute creates a cause of action in a particular person, it is necessary to examine the purposes of the legislation and decide whether the injured person falls within the class of persons the statute was intended to protect and whether the harm complained of was the harm it was intended to prevent. *Manley v. Gwinnett Place Assoc.*, 216 Ga. App. 379, 381 (2) (454 SE2d 577) (1995); *Horney v. Panter*, 204 Ga. App. 474, 476 (420 SE2d 8) (1992).

OCGA § 19-7-5 (a) specifically states that the purpose behind the statute is "to provide for the protection of children whose health and welfare are adversely affected and further threatened by the conduct of those responsible for their care and protection." Thus the statute was explicitly designed to protect children affected by child abuse. Odem clearly does not fall within that class of protected persons, and his claim under OCGA § 51-1-6 cannot survive summary judgment.

Odem's claim under OCGA § 51-1-8 also is without merit. Odem's relationship with Pace was defined by contract, and the mere breach of that contract does not give rise to tort liability. See *Hanson v. Aetna Life & Cas.*, 625 F2d 573 (5th Cir. 1980).

Therefore, we affirm the trial court's grant of summary judgment on these claims.

*Judgment affirmed. Beasley and Ruffin, JJ., concur.*

DECIDED DECEMBER 4, 1998

*Parks, Chesin & Miller, Harlan S. Miller III, Marni K. Brown,* for appellant.

*Smith, Gambrell & Russell, Rex M. Lamb III, Thomas M. Barton,* for appellee.