## A00A2350. KAISER v. TARA FORD, INC.
(546 SE2d 861)

ANDREWS, Presiding Judge.

Marc J. Kaiser appeals from the trial court's grant of summary judgment to Tara Ford, Inc. d/b/a Allen Vigil's Southlake Ford (Southlake) on his claims for malicious prosecution, intentional infliction of emotional distress, defamation, and failure to supervise

---

and train employee Barbara Keller and a claim pursuant to OCGA § 51-1-6.[1]

In reviewing a grant of summary judgment pursuant to the standards set out in *Lau's Corp. v. Haskins*, 261 Ga. 491 (405 SE2d 474) (1991), this Court conducts a de novo review of the law and the evidence, *Desai v. Silver Dollar City*, 229 Ga. App. 160, 163 (1) (493 SE2d 540) (1997), giving the opposing party the benefit of all reasonable doubt and construing the evidence and all inferences and conclusions therefrom most favorably toward the party opposing the motion. *Clark v. Cauthen*, 239 Ga. App. 226, 227 (1) (520 SE2d 477) (1999). If a defendant who does not bear the burden of proof at trial demonstrates that there is no evidence sufficient to create a jury issue on at least one essential element of plaintiff's case, the burden shifts to the nonmoving party to point out specific evidence giving rise to a triable issue. *Lau's Corp.*, supra.

So viewed, the evidence[2] was that in 1994, the City of Pioneer Village, Kentucky, maintained a volunteer police force and Kaiser participated. The city had only two used police cars, about ten years old. Through donations, the city was able to purchase a new police interceptor Crown Victoria from Southlake, which was titled in the name of the city. Because the police force was volunteer, the city allowed individual police officers to purchase police cars which were then leased to the city for $1 a year so the city could assist in providing insurance.

Kaiser, who was appointed Chief of Police by Mayor Welker in late summer 1994, assisted in outfitting the new police car and knew it came from Southlake. Kaiser asked the mayor if the city would object if he purchased a similar vehicle, and Welker told him there was no problem, but the city could not pay for it.

Southlake first created a fleet department in 1989 to deal with commercial and government entities needing fleets of vehicles. Speckter, who set up the fleet department and was its first manager, greatly increased Southlake's inventory of police cruisers in late 1991 and early 1992, to the extent that Southlake had to rent Atlanta Raceway for additional storage of the cars.

Keller began working in the fleet department in 1990. At that time, two different engine sizes were available in the police cruisers, the larger of which Keller understood could be sold only to govern-

---

[1] Kaiser's brief is in violation of Rule 27 (c) (1) of this Court because his arguments are not made in the order of the enumerations of error, making our analysis more difficult than normal.

[2] Several depositions contained in the record were received by this Court sealed and were opened here for our consideration. These depositions are properly considered to determine whether the facts of the case create an issue of material fact for determination below. *Taylor v. Schander*, 207 Ga. App. 627, 628 (2) (428 SE2d 806) (1993).

ment agencies, while the smaller engine could be sold to individuals. In fact, Ford Motor Company's (Ford) policy manual, which Keller had never seen, provided that model P71 (the Police Interceptor)

> is only available for sale to state or local governments including fire departments and railroad security agencies for use as an emergency vehicle. An emergency vehicle is used as a police vehicle or for other law enforcement purposes. Police Interceptor cars *may not* be sold or leased to an individual deputy or constable for registration in his or her name.

(Emphasis in original.)

During 1992 and 1993, Speckter and Keller apparently were selling these police cruisers to private entities and individuals in violation of this policy. All documents originating from Ford and maintained by Southlake would reflect only the government entity as owner of the vehicles sold to individuals. Speckter and Keller, however, would add the individuals' names to the documents given to the purchasers for the purpose of titling the vehicles.

In early 1994, Speckter informed Keller that "absolutely none" of the police cruisers could be sold to any entity other than a government agency and no cars were to be sold to individuals.

In mid-1994, Keller dealt with Mayor Welker and sold the first police cruiser to the city. That car was properly titled in the city, pursuant to Ford's policy and, apparently, the law of Kentucky. A month or two later, Keller was again contacted by Welker who inquired about a second car for one of his deputies. Keller advised the mayor that the car could be sold only to a governmental agency, and Welker told her he would have the deputy contact her. Kaiser called her a few days later and was told that there was another cruiser available. Kaiser understood that the car would be titled jointly in his name and that of the city.

Kaiser contacted his bank, and a loan was made to Kaiser and his wife. A cashier's check was issued by the bank on October 8, 1994, payable to Southlake and Kaiser. Because Kaiser was unable to go, his friend Condor flew to Atlanta with the cashier's check to pick up the cruiser. When Keller received the check, she typed in "/City of Pioneer Village" after Kaiser's name. She later signed "City of Pioneer Village" to the back of the check. On the Manufacturer's Statement of Origin and the dealer's invoice, which originally were made out with the city only as the purchaser, Keller typed in Kaiser's name.

The car was taken to Kentucky by Condor and turned over to Kaiser, with the altered invoice, Manufacturer's Statement of Origin,

and copy of the check. The check, as altered by Keller, was returned to the bank and placed in Kaiser's file where it and the altered title remained for a period of time, although the alterations were not noted by the bank. Although Keller had given Condor a copy of the cashier's check to take back to Kaiser, it had been copied before the alteration in payee was made. Kaiser took the Manufacturer's Statement of Origin to register the car in Kentucky. In order to do so, it was necessary that a Vehicle Transaction Report (VTR) be completed. Kaiser completed the buyer's side of the VTR, reflecting himself and the city as buyers of the car.

In November 1994, an election in Pioneer Village resulted in five of six council members being replaced. As a result, one of the new council members filed a complaint with the Kentucky Attorney General's Office regarding improper purchases by city officials, including the mayor, of surplus automobiles, including police vehicles, from the State for use by private citizens. An investigation was begun by the Auditor of Public Accounts in the spring of 1995. Because of a fatality involving one of the privately used surplus police cars, the auditor initiated a check of the title status of all Pioneer Village vehicles.

Kaiser's car, although not surplus and not involved in that investigation, was on the list retrieved and became the subject of a criminal investigation by the Attorney General's Special Investigations Division because it was jointly titled.

Attorney General's Investigator McAuliffe was assigned to the investigation of the Kaiser purchase. Kaiser knew McAuliffe from prior joint city/state investigations. During one of these investigations, McAuliffe had asked Kaiser to allow the State to claim part credit for a drug deal in order to claim a portion of the federal "bonus." Because this did not go well resulting in the loss of the bonus for the city and State, Kaiser wrote a letter of complaint to the Attorney General and there was resulting "bad blood" between Kaiser and McAuliffe.

In January 1995, McAuliffe arrived at Pioneer Village City Hall with a subpoena for the mayor's records as part of the surplus property investigation.[3] Because the subpoena had the wrong name on it, Kaiser did not comply with it at that time, further angering McAuliffe.

McAuliffe repeatedly interviewed Kaiser about the car, and Kaiser showed him all his documentation, including a copy of the cashier's check made by Southlake, which did not reflect the alterations, only some bookkeeping notations made by Keller. In April 1995,

---

[3] The surplus property investigation resulted in a federal indictment of the mayor for mail fraud in 1997.

McAuliffe then telephoned Keller at Southlake and asked if she had sold police cars to Pioneer City. He advised her that he had obtained the original cashier's check from the bank and that it appeared it had been altered by the addition of "/City of Pioneer Village." McAuliffe asked Keller if the check had been altered at the dealership, and she denied it. McAuliffe then faxed Keller a copy of the check and telephoned her again on June 29, 1995. He went over the same facts and asked again if the alteration occurred at Southlake, and Keller again denied it. At some point in 1995, after speaking to McAuliffe, Keller went to Nelson, who became fleet manager in 1994 after Speckter was fired, and told him that the Kaiser check had been altered while in the possession of Southlake and she had not told McAuliffe the truth about it. Nelson told her to "stay out of it" and not say anything else to anyone about the Kentucky matter. Nelson left Southlake on November 20, 1995. Burtner, who was assisting with the fleet department after Nelson's departure, asked Keller if she had done anything improper in the Kaiser transaction, and she said no.

Southlake's original file on the Kaiser transaction was requested for the investigation. The file was reviewed by Southlake's business manager Herzberg and general manager Cason. Since the documents in Southlake's files reflected only the city as the purchaser, no problem was noted and the file was forwarded to McAuliffe.

After McAuliffe concluded his investigation, the case was directly submitted to Commonwealth Attorney Mann of Bullitt County. On a direct submission, Mann made the decision whether to submit the matter to the grand jury and prepared any proposed indictment. Mann, based on McAuliffe's investigation, prepared a four-count indictment against Kaiser for forging the check (Count 1); the certificate of origin (Count 2); the new car invoice (Count 3); and the VTR (Count 4). The only witness to appear before the grand jury was McAuliffe, and a true bill was returned on November 15, 1995.

Pursuant to a request by Mann's office, on November 30, 1995, Southlake forwarded to him certified copies of the sales documents and exemplars from office typewriters. Pursuant to a document subpoena, Southlake later provided the original documents.

Kaiser's trial was scheduled for October 1996, and, prior to that time, Mann telephoned Keller and asked her if she had added anything to the check, and she again denied it. She also denied it when asked by Southlake personnel. A witness subpoena, dated October 11, 1996, was served on Keller for her appearance two weeks later at trial, although Southlake had been unaware that a live witness, as opposed to documentation, was going to be needed. Southlake's counsel advised Mann that the subpoena was not enforceable in Georgia. Pursuant to a personal request from Mann, however, Southlake and its counsel agreed to have Keller attend the trial.

While waiting in the witness room, Keller was asked by Kaiser's counsel to give handwriting samples. Comparing these with the handwriting on the check, the expert concluded that Keller had signed "City of Pioneer Village" on the back. Confronted by Mann and Kaiser's attorney, Keller admitted signing the check, but denied all of the other alterations. Pursuant to Mann's request, the trial court dismissed the first three counts of the indictment. Because Kaiser acknowledged that he had filled out the VTR, Mann did not move to dismiss that count, but it was dismissed on Kaiser's motion.

At no point during the investigation and trial did Keller say to McAuliffe or Mann or any representative of Southlake that Kaiser had altered the documents.

Upon returning from Kentucky on November 4, 1996, Keller was called in by Cason and asked why she had lied to him. She said she knew she would be fired by Southlake for falsifying company records, and she was terminated that day.

Kaiser initially sued Southlake, Keller, and McAuliffe in Kentucky. In answering that suit, Keller again acknowledged forging the check, but again denied altering the other documents. Named as a codefendant when the suit was refiled in Georgia (the present action), Keller acknowledged altering only the check and denied the other documents.

It was not until her affidavit of October 12, 1998, that Keller acknowledged making all of the alterations.

All of Kaiser's causes of action against Southlake, except that claiming failure to supervise and train Keller, seek to impose vicarious liability on Southlake for Keller's acts pursuant to OCGA § 51-2-2. Before such liability can be imposed, there must be evidence of the commission of a tort by the employee sufficient to survive summary judgment.

1. Kaiser contends that there was sufficient evidence of Keller's malicious prosecution of him to preclude summary judgment.

Because it is public policy to encourage citizens to bring to justice those who are apparently guilty, malicious prosecution suits are distrusted by the courts and an aggrieved party has an especially heavy burden. *Zohoury v. Home Depot*, 239 Ga. App. 454, 456 (1) (521 SE2d 389) (1999). In order to prevail, a plaintiff must show: (1) prosecution for a criminal offense instigated by defendant; (2) issuance of a valid warrant, accusation, indictment, or summons; (3) termination of the prosecution in favor of plaintiff; (4) malice; (5) want of probable cause; and (6) damage to plaintiff. OCGA § 51-7-40; *Brooks v. H & H Creek, Inc.*, 223 Ga. App. 635, 636 (1) (478 SE2d 451) (1996).

(a) Inherent in this tort, as acknowledged by Kaiser in his brief, is that any prosecution must be *instigated* by the person sought to be held liable. *Willis v. Brassell*, 220 Ga. App. 348, 350 (1) (469 SE2d

733) (1996). The evidence here shows, without dispute, that the prosecution of Kaiser began, not with the provision of any information to Kentucky authorities by Keller, but by happenstance during the ongoing Kentucky investigation into abuse of surplus property. It was not until McAuliffe contacted Keller that she provided any information, and there is no evidence that she ever told anyone that Kaiser forged the documents, although she continued to deny that she had made any alterations until Kaiser's trial.

> "The law draws a fine line of demarcation between cases where a party directly or indirectly urges (the initiation of) criminal proceedings and cases where a party merely relays facts to (one) who then makes an independent decision to arrest or prosecute. In the former case there is potential liability for malicious prosecution; in the latter case there is not. It is clear, though, that initiation of the criminal action need not be expressly directed by the party to be held liable." (Citation and punctuation omitted.) [*Willis*, supra] at 350-351 (1) (a). A person may be held liable for unduly influencing the decision to prosecute by providing information that is known to be false, misleading or materially incomplete. Id. at 351 (1) (a).

*Brooks*, supra at 636-637 (1) (a).

Keller did not provide information to McAuliffe which implicated Kaiser, but only denied that any alteration of the documents had occurred at Southlake. Kaiser argues that this created an inference that Kaiser had committed the forgery. "[H]owever, 'an inference cannot be based upon evidence which is too uncertain or speculative or which raises merely a conjecture or possibility. [Cits.]' " *Shadburn v. Whitlow*, 243 Ga. App. 555, 557 (533 SE2d 765) (2000).

(b) Even pretermitting the issue of instigation, however, Kaiser's contention that summary judgment was improper is also defeated by consideration of the element of lack of probable cause.

Here, the return of the indictment by a grand jury investigating the alleged forgery is prima facie, but not conclusive, evidence of the existence of probable cause. *Fleming v. U-Haul Co.*, 246 Ga. App. 681, 683 (2) (541 SE2d 681) (2000); see *Zohoury*, supra.

(c) Even assuming, without deciding, that there was no probable cause, summary judgment was properly granted because there was no showing of malice on the part of Keller in her actions.

"Malice consists of: (1) personal spite, or (2) 'general disregard of the right consideration of mankind, directed by chance against the individual injured.' OCGA § 51-7-2." *Desmond v. Troncalli Mitsubishi*, 243 Ga. App. 71, 75 (2) (532 SE2d 463) (2000).

Here, the only contact between Keller and Kaiser was two telephone calls discussing the purchase of the car. While she denied to McAuliffe that the alterations were made at Southlake, her motive for doing that, as she stated, was fear of losing her job, which she did when the truth was revealed.

Therefore, Kaiser has failed to come forth with evidence creating an issue for trial as to malice, and summary judgment was proper on this ground. Compare *Desmond*, supra, with *Brooks*, supra.

2. Kaiser also enumerates the grant of summary judgment on his intentional infliction of emotional distress claim.

Such a claim requires establishment of the following elements: (1) the conduct must be intentional and reckless; (2) the conduct must be extreme and outrageous; (3) there must be a causal connection between the wrongful conduct and the emotional distress; and (4) the emotional distress must be severe. *Hendrix v. Phillips*, 207 Ga. App. 394, 395 (1) (428 SE2d 91) (1993).

Whether Keller's alleged conduct was sufficiently extreme or outrageous was a question of law for the court. *McClung Surveying v. Worl*, 247 Ga. App. 322, 326 (3) (541 SE2d 703) (2000).

> In order to rise to the requisite level of outrageousness, "(t)he defendant's conduct must be so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society." (Citation and punctuation omitted.) *Frank v. Fleet Finance*, 238 Ga. App. 316, 318 (518 SE2d 717) (1999).

Id.

As concluded in Division 1 (c), there was not sufficient evidence to create a factual issue as to malice. Neither was there enough to show the elements of intentional infliction of emotional distress. Even a showing of actual malice or that degree of aggravation which might entitle one to recover punitive damages for another tort will not suffice. *Desmond*, supra at 76 (4); *Jarrard v. United Parcel Svc.*, 242 Ga. App. 58, 61 (529 SE2d 144) (2000); *Odem v. Pace Academy*, 235 Ga. App. 648, 655 (2) (510 SE2d 326) (1998).

Summary judgment was appropriate on this claim.

3. Kaiser also alleged defamation in that Keller "maliciously and falsely [made] both oral and written statements to investigators from the State of Kentucky and others accusing [him] of crimes that he did not commit."

As set out above, there has been no showing that Keller made any statement to McAuliffe, prosecutor Mann, or anyone else that Kaiser had forged the documents. Again, an inference based on uncertain or speculative evidence or which merely raises a conjecture

or possibility will not preclude summary judgment. *Shadburn*, supra.

4. Kaiser's contention that his claim that Southlake failed to properly train and supervise Keller should have survived summary judgment is without merit.

Although Georgia recognizes a cause of action for negligent hiring/retention, OCGA § 34-7-20, there is no evidence here that, when Keller was hired or prior to the revelation of the Kaiser forgery, there had been any indication to Southlake of any criminal propensities on her part. *Kemp v. Rouse-Atlanta, Inc.*, 207 Ga. App. 876, 878 (1) (429 SE2d 264) (1993). Upon Keller's acknowledgment of the forgery, she was not retained, but was in fact terminated. No cause of action has been supported, and summary judgment was proper. Id.

5. Kaiser also made a claim under OCGA § 51-1-6. That statute, however,

> does not confer a separate cause of action in tort upon one who has suffered a breach of a legal or a private duty. OCGA § 51-1-6, standing alone, creates no cause of action. Rather, it simply authorizes the recovery of damages for the breach of a legal duty otherwise created. [Cit.]

*Parris v. State Farm &c. Ins. Co.*, 229 Ga. App. 522, 524 (494 SE2d 244) (1997).

*Judgment affirmed. Ruffin and Ellington, JJ., concur.*

DECIDED MARCH 7, 2001 — 

*Brian B. Pastor*, for appellant.
*Byrne, Moore & Davis, A. L. Mullins, Jr.*, for appellee.