## A06A1436. TODD et al. v. BYRD.
(640 SE2d 652)

BARNES, Judge.
Fred's Stores of Tennessee and its employees Joyce Todd and Phyllis Purcell (collectively "the Fred's Store defendants") appeal the

---

[2] The record before us does not include any other guaranty that may have been executed at the same time as the lease.

trial court's denial of their motion for summary judgment on the claims of the plaintiff, Sylvia Byrd, as next friend of her nine-year-old daughter Tynesha, arising from Tynesha's visit to Fred's Store. For the reasons that follow, we affirm in part and reverse in part the trial court's order denying summary judgment to the defendant.

1. Byrd's brief "specifically incorporates, and adopts as if set out verbatim herein," arguments contained in certain briefs filed in the trial court. Although preparing an appellee's brief in this manner may have been convenient for Byrd's attorney, this practice is not approved by this Court and we decline to look in the record for matters which should have been set forth in the brief. Moreover, if we were to permit this practice a party could evade entirely the page limitations on briefs established in our Rules. See Court of Appeals Rule 24 (f). Accordingly, we have limited our review of Byrd's arguments to those actually made in her appellate brief.

2. Summary judgment

> is proper when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. OCGA § 9-11-56 (c). To obtain summary judgment, a defendant need not produce any evidence, but must only point to an absence of evidence supporting at least one essential element of the plaintiff's claim. *Lau's Corp. v. Haskins*, 261 Ga. 491 (405 SE2d 474) (1991). We apply a de novo standard of review to an appeal from a grant [or denial] of summary judgment and view the evidence, and all reasonable conclusions and inferences drawn from it, in the light most favorable to the nonmovant.

(Citation omitted.) *Ponder v. Brooks*, 256 Ga. App. 596, 597 (569 SE2d 267) (2002).

Viewed in the light most favorable to Byrd, as the nonmovant, the record shows that Byrd and her daughter Tynesha were shopping at a Goodwill store around 5:00 p.m. when Tynesha needed to use a bathroom. Because the Goodwill store's bathroom was out of service, Byrd told her daughter to go next door to Fred's, where Purcell and Todd were working, and use its bathroom. Tynesha went into Fred's for the sole purpose of using its bathroom, which Purcell had cleaned earlier in the day, and which Todd (the manager) had checked at noon. Tynesha testified that they only planned to shop at Goodwill.

Tynesha testified that when she entered the bathroom, she noticed feces on the toilet seat and saw blood, bloody underwear, and an empty underwear package in the trash can. Purcell, who was working next to the bathroom, noticed a strong smell of feces coming from it, even though its door was shut. When Tynesha left the

bathroom, Purcell saw her, and concluded that she had been in the bathroom throughout the time during which Purcell had smelled the foul odor.

When Purcell checked the bathroom, she found fresh feces on the wall, toilet seat, and floor as well as bloody underwear and an empty underwear wrapper in the trash can. Because Fred's carried that brand of underwear, Purcell formed the suspicion that Tynesha might have taken some new underwear into the bathroom and then discarded both her own soiled underwear and the underwear wrapper in its trash can.

Purcell found Tynesha just outside the store, accused her of stealing underwear, and asked her to return to the store to speak to Todd. In a manner that Tynesha agreed was motherly, Purcell took her hand and led her back into the store. Tynesha felt that she had to hold Purcell's hand. Todd joined them, and the two women led Tynesha by the hand back to the bathroom and showed her the filthy scene. Purcell told Todd that Tynesha had stolen some underwear and pads, and Purcell asked her if she was on her period before she pulled the used underwear from the trash and showed it to her. At the time, the child did not understand what "pads" were and had not yet begun to have her period.

Todd then asked Tynesha if she could see her underwear. When the girl said nothing, Todd lifted her shirt and said she saw that she was wearing a brand matching the discarded package. Tynesha, however, claims that Purcell said the brands were not the same. Todd then told Tynesha to leave the store and not to return without an adult. Tynesha left and began crying outside the store.

Byrd soon entered the store with her daughter and began yelling, cursing, and throwing merchandise. Byrd testified that Tynesha was crying outside the store, fainted in the car afterward, has woken up crying about the incident, and has had nightmares. Tynesha confirmed she had dreamed of being at Fred's when "bad people" came after her, and it now "bothers her" to go into a store or a different part of the store by herself for fear of a similar incident.

Byrd brought suit on her daughter's behalf alleging torts of tortious misconduct, invasion of privacy, intentional infliction of emotional distress, false imprisonment, and false arrest.[1] Although the Fred's Store defendants argue that the trial court erred by denying their motion for summary judgment on Byrd's claim for damages for battery, no such count is contained in the complaint.

The complaint sought general and exemplary damages and expenses of litigation and attorney fees. The Fred's Store defendants

---

[1] Byrd also brought claims for kidnapping and assault, but she withdrew these claims.

answered denying liability and after discovery, they filed motions for summary judgment. Byrd responded to the motion, and the trial court denied the defendants' motion for partial or entire summary judgment without explaining its reasoning.[2] After our grant of an interlocutory appeal, this appeal followed.

3. The Fred's Store defendants first argue that the trial court should have granted them summary judgment on Byrd's tortious misconduct claim because Tynesha was not an invitee. A claim for tortious misconduct "arises when a customer-invitee on the premises of the invitor for the purpose of transacting business is subjected to abusive, opprobrious, insulting, or slanderous language by an agent of the invitor." (Citations omitted.) *Carter v. Willowrun Condo. Assn.*, 179 Ga. App. 257, 259 (3) (345 SE2d 924) (1986). Thus Byrd can maintain a tortious misconduct claim only if her status was that of an invitee.

> The general test as to whether a person is an invitee or a licensee is whether the injured person at the time of the injury had present business relations with the owner of the premises which would render his presence of mutual aid to both, or whether his presence on the premises was for his own convenience, or on business with others than the owner of the premises. *In the absence of some relation which inures to the benefit of the two, or to that of the owner, no invitation may be implied, and the injured person must be regarded as a licensee.*

(Citations and punctuation omitted; emphasis supplied.) *Higginbotham v. Winborn*, 135 Ga. App. 753, 755 (1) (218 SE2d 917) (1975); see also OCGA § 51-3-2 (a) (3) (defining licensee as someone "permitted, expressly or impliedly, to go on the premises merely for his own interests, convenience, or gratification").

Although Byrd contends that Tynesha met the legal definition of an invitee under OCGA § 51-3-1 because Fred's Store was in the business of selling goods to all comers, the evidence is uncontroverted that Tynesha had no intention of shopping at Fred's Store, and that her only purpose in entering was to use the bathroom. Thus a claim for tortious misconduct is not available to Byrd on behalf of her daughter. *Carter*, supra, 179 Ga. App. at 259 (3) (affirming grant of

---

[2] We note that the trial court denied summary judgment on August 10, 2005, but that, after the parties jointly moved to vacate and reissue the order because the Fred's Store defendants had not received the order, the trial court vacated the earlier order, relying upon OCGA § 15-6-21 and *Cambron v. Canal Ins. Co.*, 246 Ga. 147, 148-149 (269 SE2d 426) (1980).

summary judgment when plaintiff asserting tortious misconduct claim was not an invitee of defendants).

Accordingly, the trial court erred by denying the Fred's Store defendants' motion for summary judgment on Byrd's claim of tortious misconduct, and therefore, the trial court's judgment is reversed and the case remanded with direction to enter summary judgment in favor of Todd, Purcell, and Fred's Stores of Tennessee on this claim.

4. The Fred's Store defendants also assert that the trial court erred by denying their motion for summary judgment on Byrd's claim for intentional infliction of emotional distress. They argue that their conduct did not rise to the level of outrageousness and egregiousness required to maintain an action for this tort, and whether that standard is met is a question of law for the court. See *Mableton Parkway CVS v. Salter*, 273 Ga. App. 477, 482 (2) (c) (615 SE2d 558) (2005).

The elements of a cause of action for intentional infliction of emotional distress are: (1) intentional or reckless conduct; (2) that is extreme and outrageous; (3) a causal connection between the wrongful conduct and the emotional distress; and (4) severe emotional distress. *Bridges v. Winn-Dixie Atlanta*, 176 Ga. App. 227, 230 (1) (335 SE2d 445) (1985). Further,

> [l]iability for this tort has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"

(Citations and punctuation omitted.) *Yarbrough v. SAS Systems*, 204 Ga. App. 428, 429 (3) (419 SE2d 507) (1992).

"If a reasonable person might find the conduct extreme and outrageous, causing severe emotional distress, the jury then must find the facts and make its own determination." (Citation omitted.) *Mableton Parkway CVS v. Salter*, supra, 273 Ga. App. at 482-483 (2) (c).

Much of the Fred's Store defendants' argument on this and the other issues rests on their contention that Tynesha consented to their actions. Regardless of the validity of this argument when adults are involved, we cannot lose sight of the plain fact that Tynesha was a nine-year-old child when these events took place. At that age her ability to consent to anything, much less the actions of adults who

were cloaked with the authority of store employees, is highly doubtful. In another context and regarding a child one year older than Tynesha, our Supreme Court said:

> The younger a child the less likely that he or she can be said to have the minimal discretion required to validly consent to a search, much less waive important constitutional rights. Judicial vigilance is especially merited when, as here, the child is quite young. Most ten-year-old children are incapable of understanding and waiving their own rights. . . .

*Davis v. State*, 262 Ga. 578, 581 (1) (422 SE2d 546) (1992). Additionally, in *Sorrells v. Miller*, 218 Ga. App. 641, 642 (2) (462 SE2d 793) (1995), this court held that in Georgia "children below the age of 13 are immune from tort liability" and that "children below the age of criminal responsibility are not capable of negligence per se because, under our law, such a child could not be guilty of violating criminal law. In this state the age of criminal responsibility is 13. OCGA § 16-3-1." (Citations omitted.) The court also stated that "whether a child can be contributorily negligent depends upon each child's mental and physical capabilities, and that question is one for the jury." (Citation omitted.) Id. at 642 (3). Therefore, we decline to assume that merely because a nine-year-old child assented to the requests of adults, she consented to their treatment of her. Further, as a nine-year-old child, Tynesha was legally incapable of giving consent to the defendants' actions. OCGA § 51-11-2.[3] See also OCGA § 51-11-6;[4] *McNamee v. A. J. W.*, 238 Ga. App. 534, 538 (3) (519 SE2d 298) (1999).

Given the Fred's Store defendants' conduct toward Tynesha discussed above, the trial court did not err by denying their motion for summary judgment on this claim. Notwithstanding Tynesha's testimony that she felt they were "nice and sweet" to her, they led her by the hand back into the store even though she did not want to go, accused her of theft, caused her to reveal her underwear, and put dirty, bloody, smelly underwear in her face for her to see. Further, Tynesha also testified that she has had nightmares and is afraid to

---

[3] "As a general rule no tort can be committed against a person consenting thereto if that consent is free, is not obtained by fraud, and is the action of a sound mind. The consent of a person incapable of consenting, such as a minor, may not affect the rights of any other person having a right of action for the injury."

[4] "Infancy is no defense to a tort action so long as the defendant has reached the age of discretion and accountability prescribed by Code Section 16-3-1 for criminal offenses," which is 13.

shop by herself. Under this evidence, the jury should make the determination of liability.

5. The Fred's Store defendants also contend the trial court erred by denying their motion for summary judgment on Byrd's claim for false arrest because no arrest occurred and they did not act maliciously. See OCGA § 51-7-1: "An arrest under process of law, without probable cause, when made maliciously,[5] shall give a right of action to the party arrested." Underlying the Fred's Store defendants' argument is the conclusion that Tynesha consented to their conduct. For the reasons stated above we find the arguments based on consent to be without merit.

The Fred's Store defendants also contend that as a matter of law, Byrd failed to establish that an intentional arrest took place. The parties agree that there was no arrest pursuant to a warrant, but that does not end our inquiry as an arrest may be accomplished without a warrant, and an action for false arrest may be brought for a warrantless arrest. *Gantt v. Patient Communications Systems*, 200 Ga. App. 35, 38 (2) (a) (406 SE2d 796) (1991).

The initial issue to be addressed is whether an arrest took place. "An arrest is accomplished whenever the liberty of another to come and go as he pleases is restrained, no matter how slight such restraint may be." (Citation and punctuation omitted.) *Jackson v. State*, 191 Ga. App. 439, 441 (2) (382 SE2d 177) (1989). The Fred's Store defendants contend no arrest took place because they did not intend to arrest Tynesha; they only wanted to check on her and make inquiries of her. Because the record shows that they also took Tynesha back in the store and led her around by the hand, whether an arrest was made is a question for the jury.

Even though denying that Tynesha was arrested, the Fred's Store defendants also contend that they had probable cause to arrest her, and that the trial court erred by not finding that they had probable cause to do so. Under OCGA § 51-7-3[6] lack of probable cause is a question for the jury, unless Byrd presented no evidence on the issue. *McGonagil v. Treadwell*, 216 Ga. App. 850, 854 (2) (456 SE2d 260) (1995). Here, of course, Byrd presented evidence that Fred's Stores' employees knew the bathroom had not been checked for five hours before Tynesha entered, knew that one of them was aware that the bathroom smelled before Tynesha entered, and that the employee

---

[5] "Malice consists in personal spite or in a general disregard of the right consideration of mankind, directed by chance against the individual injured." OCGA § 51-7-2.

[6] "Lack of probable cause shall exist when the circumstances are such as to satisfy a reasonable man that the accuser had no ground for proceeding but his desire to injure the accused. Lack of probable cause shall be a question for the jury, under the direction of the court."

based her decisions not on Tynesha's conduct, but on the smell emanating from the bathroom.

Moreover,

> [m]alice, the final element comprising the tort of false arrest, is defined by statute as "a general disregard of the right consideration of mankind, directed by chance against the individual injured." OCGA § 51-7-2. Malice can be inferred where there is a total absence of probable cause.

(Citations omitted.) *Simmons v. Kroger Co.*, 218 Ga. App. 721, 723 (1) (463 SE2d 159) (1995). Considering the employees' actions were directed toward a nine-year-old girl, the trial court did not err by denying the motion for summary judgment on this issue.

6. The Fred's Store defendants also contend that the trial court erred by denying their motion for summary judgment on Byrd's claim based on false imprisonment, see OCGA § 51-7-20,[7] because no imprisonment occurred and because they had a reasonable belief that Tynesha had shoplifted. They argue that for Byrd to recover on this claim she must show that Tynesha was unlawfully detained or imprisoned and that the Fred's Store defendants must have intended to cause Tynesha's arrest or confinement. They rely upon *Corporate Property Investors v. Milon*, 249 Ga. App. 699, 705 (2) (549 SE2d 157) (2001) (physical precedent only).

They maintain that Tynesha was not unlawfully detained or imprisoned because she willingly accompanied the employees to prove her innocence and to keep them from thinking she had done something wrong. In essence, they reargue that Tynesha consented to their actions, as they did in the false arrest claim and further contend that they had no intention of detaining the child. We reject their argument that Tynesha was not detained or imprisoned for the same reasons we rejected this argument regarding the false arrest claim in Division 4, supra. Moreover, at the very least we find an issue of fact exists on whether Tynesha consented to their actions or merely submitted to the exercise of their authority. "The restraint constituting a false imprisonment may arise out of words, acts, gestures or the like, which induce a reasonable apprehension that force will be used if plaintiff does not submit; and it is sufficient if they operate upon the will of the person threatened, and result in a reasonable fear of personal difficulty or personal injuries." (Citation and punctuation omitted.) *Sinclair Refining Co. v. Meek*, 62 Ga. App. 850, 854 (3) (10

---

[7] "False imprisonment is the unlawful detention of the person of another, for any length of time, whereby such person is deprived of his personal liberty."

SE2d 76) (1940). "The only essential elements of the action being the detention and its unlawfulness, malice and the want of probable cause need not be shown." (Citations and punctuation omitted.) Id. " 'To constitute false imprisonment, there must be actual physical restraint whether by force or *fear.' Sinclair Refining Co. v. Meek*, supra at 854 (2)." (Emphasis supplied.) *Williams v. Smith*, 179 Ga. App. 712, 713 (1) (348 SE2d 50) (1986).

The evidence shows that the store's employees found Tynesha in front of the store, and taking her by the hand, led her back in the store and into the bathroom where they showed her its condition and questioned her about the underwear. Thus, whether Tynesha was unlawfully detained or imprisoned is a question for the jury.

The Fred's Store defendants also contend that, even if an issue exists on whether Tynesha was unlawfully detained, the employees had a reasonable belief that Tynesha had shoplifted. OCGA § 51-7-60.[8] As they rely on subsection (1) of the Code section, for OCGA § 51-7-60 to apply Tynesha must have conducted herself "or behaved in such manner as to cause a man of reasonable prudence to believe that [she], at or immediately prior to the time of the detention or arrest, was committing the offense of shoplifting, as defined by Code Section 16-8-14."

The Fred's Store defendants base their argument on the allegations that Tynesha was seen leaving the bathroom in which a trash can containing an empty underwear wrapper of the same brand of underwear that Tynesha was wearing, that the door to the bathroom had been closed for some time, and that they did not see Tynesha enter the bathroom, even though an employee had been in the area for "quite a while." The actions the Fred's Store defendants rely upon, with the exception of the brand of underwear Tynesha was allegedly wearing, were not the result of Tynesha's suspicious conduct or behavior, and the brand of underwear is disputed. Moreover, even if Tynesha were wearing the same brand of underwear, this was not known until after she was detained and escorted to the bathroom, and

---

[8] Whenever the owner or operator of a mercantile establishment or any agent or employee of the owner or operator detains, arrests, or causes to be detained or arrested any person reasonably thought to be engaged in shoplifting and, as a result of the detention or arrest, the person so detained or arrested brings an action for false arrest or false imprisonment against the owner, operator, agent, or employee, no recovery shall be had by the plaintiff in such action where it is established by competent evidence:

(1) That the plaintiff had so conducted himself or behaved in such manner as to cause a man of reasonable prudence to believe that the plaintiff, at or immediately prior to the time of the detention or arrest, was committing the offense of shoplifting, as defined by Code Section 16-8-14; or

(2) That the manner of the detention or arrest and the length of time during which such plaintiff was detained was under all the circumstances reasonable.

thus could not provide a basis for the initial detention. In any event, "whether the defendant[s] acted with reasonable prudence [is] a matter for the jury, not the court, to determine." (Citation and punctuation omitted.) *Bi-Lo, Inc. v. McConnell*, 199 Ga. App. 154, 156 (3) (404 SE2d 327) (1991).

They also contend that they are entitled to summary judgment on this claim "because any alleged detention was brief and pleasant." Even if true, however, a "brief and pleasant" detention would still be a detention, and would provide no basis for granting summary judgment. The essential elements of an action for false imprisonment are only the detention and its unlawfulness. *Sinclair Refining Co. v. Meek*, supra, 62 Ga. App. at 854.

Accordingly, the trial court did not err by denying the Fred's Store defendants' motion for summary judgment on this claim.

7. The Fred's Store defendants contend the trial court erred by denying their motion for summary judgment on Byrd's claims for invasion of privacy because the defendants did not lift Tynesha's shirt and merely asking a question did not constitute invasion of privacy. We disagree.

This argument is again premised on Tynesha's actions in lifting her shirt and thus allegedly consenting to the defendants' acts. We do not hold a nine-year-old child to the same standards as an adult capable of consenting or voluntarily lifting her shirt. Thus, we find that under the facts of this case, in which the principal party involved was a nine-year-old girl, the trial court did not err by denying the motion for summary judgment.

8. The Fred's Store defendants contend the trial court erred by denying their motion for summary judgment on the claim of battery because there was no intentionally harmful, insulting, or provoking contact. As stated above, Byrd brought no such claim and thus it is unnecessary to address this contention.

9. The Fred's Store defendants contend the trial court erred by denying their motion for summary judgment on Byrd's claims for punitive damages and damages based on bad faith and stubborn litigiousness because those claims are dependent upon the survival of the other causes of action, and they contend they were entitled to summary judgment on those claims.

(a) We find that issues of fact exist on whether Byrd is entitled to punitive damages. OCGA § 51-12-5.1 (b) provides that

> [p]unitive damages may be awarded only in such tort actions in which it is proven by clear and convincing evidence that the defendant's actions showed willful misconduct, malice,

fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences.

In this State,

something more than the mere commission of a tort is always required for punitive damages. There must be circumstances of aggravation or outrage. There is general agreement that, because it lacks this element, mere negligence is not enough. If a tort is committed through mistake, ignorance, or mere negligence, the damages are limited to the actual injury received, for vindictive or punitive damages are recoverable only when a defendant acts maliciously, wilfully, or with a wanton disregard of the rights of others.

(Citations and punctuation omitted.) *Roseberry v. Brooks*, 218 Ga. App. 202, 209-210 (4) (461 SE2d 262) (1995). Here, because we have found that other claims survive which would authorize the imposition of punitive damages if the jury were to find that the Fred's Store defendants acted with a wanton disregard of the rights of Tynesha, the trial court did not err by denying the motion for summary judgment on these grounds.

(b) The Fred's Store defendants also assert that because they were entitled to summary judgment on Byrd's tort claims they are entitled also to summary judgment to her claim for expenses of litigation under OCGA § 13-6-11, and that even if summary judgment was not appropriate on all of her claims, the record demonstrates that she is not entitled to recovery under this Code section. They rely upon *4WD Parts Center v. Mackendrick*, 260 Ga. App. 340, 345 (2) (b) (579 SE2d 772) (2003). "Questions concerning bad faith, stubborn litigiousness, and unnecessary trouble and expense, under OCGA § 13-6-11, are generally questions for the jury to decide." (Citations and punctuation omitted.) *American Med. Transport Group v. Glo-An, Inc.*, 235 Ga. App. 464, 467 (3) (509 SE2d 738) (1998). Further, where

bad faith is not an issue and the basis for attorney fees is either stubborn litigiousness or unnecessary trouble and expense, there is not any evidence to support an award pursuant to OCGA § 13-6-11 if a bona fide controversy clearly exists between the parties. [Cit.]

*Morris v. Savannah Valley Realty*, 233 Ga. App. 762, 764 (3) (505 SE2d 259) (1998).

While Byrd would not be entitled to attorney fees due to the presence of a bona fide controversy in this case, her causes of action include intentional torts. Therefore, if proven, these torts would authorize damages under OCGA § 13-6-11 because "[e]very intentional tort invokes a species of bad faith that entitles a person wronged to recover the expenses of litigation including attorney fees." *DeKalb County v. McFarland*, 231 Ga. 649, 651 (1) (b) (203 SE2d 495) (1974).

Under the facts discussed above, the trial court did not err by denying the motion on these grounds.

10. Finally, the Fred's Store defendants assert the trial court erred by refusing to strike evidence of Purcell's conviction for violating OCGA § 16-10-24,[9] obstructing or hindering law enforcement officers, which Byrd submitted in connection with her response to the defendants' motion for summary judgment. They claim that impeachment with a conviction that occurred after Purcell gave her deposition testimony is not allowed. They also argue that this crime was really a misdemeanor that is only a felony "because of a peculiar legislative amendment which changed the law to indicate that any obstruction involving any violence is a felony."

Although the record does not show that the trial court ruled on this motion, we will address the issue because arguably such a ruling is encompassed in the trial court's denial of summary judgment. We find no authorities supporting the Fred's Store defendants' argument that Purcell cannot be impeached by a conviction that occurred after her deposition testimony, and they have referred us to none. Although our law generally refers to impeachment by "prior convictions," that term is not used as a term of limitation in OCGA § 24-9-84.1, but only used in the title of the statute. We agree that in most instances it would be impossible practically for a witness to be impeached by a conviction occurring after the witness testifies, but we do not find that a bar to the use of this evidence. If this case goes to trial and Purcell testifies, she could be impeached by this conviction.

Further, we find no support for the Fred's Store defendants' argument that Purcell may not be impeached by a conviction for

---

[9]     (a) Except as otherwise provided in subsection (b) of this Code section, a person who knowingly and willfully obstructs or hinders any law enforcement officer in the lawful discharge of his official duties is guilty of a misdemeanor.

(b) Whoever knowingly and willfully resists, obstructs, or opposes any law enforcement officer, prison guard, correctional officer, probation supervisor, parole supervisor, or conservation ranger in the lawful discharge of his official duties by offering or doing violence to the person of such officer or legally authorized person is guilty of a felony and shall, upon conviction thereof, be punished by imprisonment for not less than one nor more than five years.

violating OCGA § 16-10-24. A conviction for violating OCGA § 16-10-24 (b), by the terms of the Code section, is a felony made punishable by imprisonment for not less than one nor more than five years. That length of punishment satisfies the requirements of OCGA § 24-9-84.1 (a) (1) for impeachment with a conviction.

Accordingly, as we have found that the trial court erred by denying the Fred's Store defendants' motion for summary judgment on Byrd's tortious misconduct claim, the trial court's order on that claim is reversed and the case is remanded to the trial court with direction to grant summary judgment on that claim. The trial court is affirmed on all other claims.

*Judgment affirmed in part and reversed in part, and case remanded with direction. Johnson, P. J., Miller and Ellington, JJ., concur. Andrews, P. J., and Bernes, J., concur in Divisions 1, 2, 3, 5, 6, 7, 8 and 9, and dissent to Divisions 4 and 10. Blackburn, P. J., concurs in Divisions 1, 2, 3, 4, 5, 6, 7, 8 and 9, and dissents to Division 10.*

ANDREWS, Presiding Judge, concurring in part and dissenting in part.

I concur in the majority opinion except for Divisions 4 and 10, to which I respectfully dissent.

As to Division 4, because the defendants' conduct did not meet the threshold necessary to sustain a claim for intentional infliction of emotional distress, the trial court erred by denying summary judgment on this claim. Construed in favor of Sylvia Byrd's claims brought on behalf of her minor child, the evidence fails to establish all of the elements which must be present to support a claim for intentional infliction of emotional distress: "(1) the conduct must be intentional or reckless; (2) the conduct must be extreme and outrageous; (3) there must be a causal connection between the wrongful conduct and the plaintiff's emotional distress; and (4) the emotional distress must be severe." (Citations omitted.) *MARTA v. Mosley*, 280 Ga. App. 486, 490-491 (634 SE2d 466) (2006). Although Byrd produced evidence that the defendants acted intentionally or recklessly toward her child (element 1), and evidence showing a causal connection between the defendants' conduct and some degree of emotional distress suffered by the child (element 3), she failed to produce evidence sufficient to show that the defendants' conduct was extreme and outrageous (element 2), or that the emotional distress suffered by the child as a result of the defendants' conduct was severe (element 4).

The female child at issue was nine years old at the time of the incident, but she was large for her age weighing between 200 and 230 pounds according to Byrd. The child testified by deposition that she walked into Fred's store to use the restroom, and that, after entering

the restroom, she left without using it because she saw "dookey" on the toilet seat, saw blood, bloody underwear, and package wrappers in the trash can, and smelled a "real bad" odor of "dookey." A store employee, Phyllis Purcell, stated by affidavit that she was near the door of the restroom when the child left, and that, because of the strong smell of feces emanating from the restroom, she went inside to check the restroom. Purcell stated that she saw fresh feces on the toilet, wall, and floor, saw fresh blood on the toilet, floor, and trash can, and saw bloody underwear and an empty merchandise wrapper in the trash can. Based on these observations, Purcell thought the child probably had some sort of problem in the restroom and was responsible for the feces and blood, and she suspected that, because of the problem, the child may have taken some Fred's merchandise and left the empty wrapper in the trash can. According to Purcell and the store manager, Joyce Todd, Purcell notified Todd of the situation, and Todd approached the child and asked her to walk back to the restroom.

The child testified that, as she walked out of the store immediately after leaving the restroom, Purcell approached her, said she stole some underwear and some pads, then took her by the hand, led her back into the store, and told Todd that she had stolen some underwear and pads. She said Todd held her hand and took her into the restroom accompanied by Purcell. According to the child, Todd said she stole something, "asked her if she had done the poop that was on the seat," asked her if she was "on her period," then used a glove to pick up the bloody underwear from the trash can and asked her if the underwear belonged to her. The child said she told Todd and Purcell that she did not steal anything, that she did not mess up the seat, and that it was not her underwear. The child further testified that, while they were in the restroom, Purcell asked if she could see her underwear, and then lifted up her shirt enough to look at the top band of her underwear which was visible above the waistband of her pants. According to the child, Purcell said that her underwear was not the same kind as the underwear in the trash can. At that point, the child said Todd told her that she could go and told her not to come back to the store unless she was accompanied by an adult.

The child testified that she left the store and immediately told her mother, Byrd, who was shopping in an adjacent store, that she had been accused of stealing from Fred's store and messing up the restroom, and that the people at Fred's wanted to talk to her. The child said she was crying at that point because she had been accused of stealing and might get in trouble with her mother. The child testified that, when they got to the store, her mother started "yelling real loud," cursing and throwing shoes. Byrd recalled at her deposition that she called Todd a bitch and a whore, and that she knocked

paperwork by the store cash register onto the floor and threw shoes and other store merchandise. According to the child, her mother's "crazy" conduct in the store scared her worse than being brought back in the store by Todd and Purcell, and that when she fainted later in the day it was because her mother had gotten her upset. When asked if the incident at Fred's store bothered her after that day, the child said she had dreams about "people coming to get me," but she said her dreams were no worse after the Fred's incident than they were before the incident. In fact, the child repeatedly testified at her deposition that Todd and Purcell spoke to her sweetly and were nice to her during the entire incident. Defense counsel questioned the child at length about any emotional distress she may have suffered as a result of the incident.

> Q: What I'm asking about is things that happened to you or problems you had because of Fred's. You didn't have any more bad dreams because of the Fred's situation, did you?
> A: No.
> Q: And everybody at Fred's was very nice to you, weren't they?
> A: Yes.
> Q: So I mean, there wasn't anything terrible about that, was it?
> A: No.
> Q: The thing that worried you the most was your mom getting all upset about it. Right?
> A: Yes.
> Q: Because the people at Fred's never acted bad to you at all, did they?
> A: No.
> Q: Any other bad dreams that you ever had after the Fred's incident?
> A: No.

The child testified that, since the incident at Fred's, it "kind of" bothers her to go into stores because "it might happen again." Byrd testified that her child had not started her menstrual cycle, did not know what "a period" was prior to being asked about it during the Fred's incident, and that, when she subsequently explained menstruation to the child, the child did not understand, had nightmares about it, and sometimes had to sleep with her. The child recalled that her mother spoke to her after the incident about menstruation, but denied having any bad dreams about menstruation and said the incident at Fred's kept her up at night on one occasion. She also testified that she woke up because of bad dreams and slept with her

mother just as much before the Fred's incident as she did after the incident. Byrd further testified that, after the Fred's incident, her child started having some back problems, and that she thought this might have been caused by stress or nervousness from the incident. When asked about the child fainting shortly after the Fred's incident, Byrd conceded that the child had a history of fainting prior to the incident any time she got nervous or upset. Finally, Byrd testified that "the aggravation of the Fred's accident could have something to do with [the child] slacking off on her work and her ability to learn." There is no evidence in the record to support the majority opinion's statement that, when Todd showed the bloody underwear to the child in the restroom, she put it "in her face for her to see."

Whether the conduct at issue was sufficiently extreme or outrageous to support a claim for intentional infliction of emotional distress is a question of law for the court. *Kaiser v. Tara Ford, Inc.*, 248 Ga. App. 481, 488 (546 SE2d 861) (2001). As the majority opinion states, to meet this stringent burden of proof, the conduct "must be so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society." (Citation and punctuation omitted.) Id. It is not enough to prevail on a claim for intentional infliction of emotional distress to show "that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by malice, or a degree of aggravation that would entitle the plaintiff to punitive damages for another tort." (Citation and punctuation omitted.) *Odem v. Pace Academy*, 235 Ga. App. 648, 654-655 (510 SE2d 326) (1998). Moreover, there is no recovery for intentional infliction of emotional distress for insults, threats, indignities, or the like, which cause commonly inflicted emotional distress "includ[ing] all highly unpleasant mental reactions such as fright, horror, grief, shame, humiliation, embarrassment, anger, chagrin, disappointment, worry, and nausea." (Citation and punctuation omitted.) *Peoples v. Guthrie*, 199 Ga. App. 119, 121 (404 SE2d 442) (1991); *Ashman v. Marshall's &c., Inc.*, 244 Ga. App. 228, 229-230 (535 SE2d 265) (2000). Rather, there must be major outrage in the conduct complained of, so beyond the bounds of decency and so atrocious and intolerable in civilized society, that it inflicts emotional distress "so severe that no reasonable [person] could be expected to endure it." (Citation, punctuation and emphasis omitted.) *Guthrie*, 199 Ga. App. at 121; *Ashman*, 244 Ga. App. at 229-230.

Construing the record in favor of Byrd on summary judgment, there is evidence that the conduct at issue was harsh, inappropriate, insulting, and embarrassing, and that it could be sufficient to support the award of damages (including possible punitive damages) for the

commission of other torts. But the conduct was not sufficient to satisfy the stringent standards for a claim of intentional infliction of emotional distress. Moreover, the record is devoid of any evidence that, as a result of the conduct at issue, Byrd's child suffered severe emotional distress.

In Division 10, the majority opinion addresses whether Purcell's conviction for violating OCGA § 16-10-24 can be used for impeachment at trial. Although the appellants enumerate as error that the trial court failed to strike the conviction, the appellants did not file a motion to strike the conviction, and the trial court has not ruled on this evidentiary issue. The present interlocutory appeal was taken from the trial court's denial of the appellants' motion for summary judgment, which does not raise the issue. In supplemental briefs in support of their motion for summary judgment, the appellants argued that Byrd was apparently attempting to impeach Purcell in her response, and that the court should "strike such evidence" because it was "irrelevant and highly prejudicial" and "does not affect the outcome of the . . . motion for summary judgment." All this amounts to is an argument that evidence of the conviction should not affect the trial court's ruling on summary judgment. The trial court's ruling on the summary judgment motion was not a ruling on this evidentiary issue for trial, so this Court, which only addresses issues ruled on by the trial court, has no jurisdiction to address it. *Carver v. Empire Fire & Marine Ins. Co.*, 270 Ga. App. 100, 105 (605 SE2d 842) (2004).

I am authorized to state that Judge Bernes joins in this opinion, and that Presiding Judge Blackburn joins in this opinion as to Division 10 of the majority opinion.

DECIDED DECEMBER 1, 2006 —
RECONSIDERATION DENIED DECEMBER 15, 2006 —

*Bouhan, Williams & Levy, Peter Muller*, for appellants.
*Sapp & Moore, Joseph E. Sapp, Joseph C. Nelson III*, for appellee.