A08A0482. UDOINYION v. RE/MAX OF ATLANTA et al.
(657 SE2d 644)

ANDREWS, Presiding Judge.

Sunday N. Udoinyion sued Re/Max of Atlanta (a real estate brokerage business) and two real estate agents affiliated with Re/Max, Bill Reed and Katie Milling, seeking damages for: (1) trespass on his property in violation of OCGA § 51-9-1; (2) invasion of privacy; (3) wilful misrepresentation of material fact in violation of OCGA § 51-6-2; and (4) intentional infliction of emotional distress. The trial court granted summary judgment in favor of the defendants on all of these claims, and Udoinyion appeals. For the following reasons, we affirm.

The record shows that, after Udoinyion put his house up for sale, Reed and Milling contacted him on multiple occasions for the purpose of showing the house to prospective buyers. According to Udoinyion, the jury issues raised in his suit are "whether a continued, unwanted solicitation by a real estate agent over time could constitute the torts of trespass, invasion of privacy, misrepresentation of fact, and intentional infliction of emotional distress." In response to the defendants' motion for summary judgment, Udoinyion argued: (1) that the invasion of privacy claim was supported by showing that Reed harassed and pestered him by calling him on the telephone to inquire about the availability of his house after he told him not to call; (2) that the trespass claim under OCGA § 51-9-1 was supported by showing that Reed came onto his property without permission and remained for a

period of time after being asked to leave, and that Milling came onto his property by fraudulently obtaining consent; and (3) that the intentional infliction of emotional distress claim was supported by showing that the defendants' conduct was intentional, reckless, and extreme, and that it caused him severe emotional distress.

In response to the motion for summary judgment, Udoinyion also filed his affidavit, which stated the following:

After Udoinyion put his house on the market in September 2004, Reed called and told him that he had a client who would like to see the house. With Udoinyion's permission, Reed brought his client to tour the house on September 20, 2004, and then left. Because of all the measurements that Reed's client took of the interior of the house, Udoinyion doubted that Reed's client intended to buy the house. Udoinyion stated that "[i]n all the houses I have built and sold, I have never seen an agent or his client bring a tape for tak[ing] these kinds of measurements." After Reed and his client left, Udoinyion decided not to do business with them because he "felt that their intentions were not genuine." Udoinyion subsequently "decided to take the house off the market hoping to stop Bill Reed from coming by and causing any more aggravation."

About eight months later on May 24, 2005, Reed called Udoinyion again saying that the same client was still interested in the house. This time Udoinyion told him that "my wife and I did not want their business and that he should not call any more." Three days later on May 27, 2005, Reed called again asking, "I wanted to find out if your wife had changed her mind." Udoinyion told him "that she had not, and that he should not call again." Reed called again on June 13, 2005, "just checking to see if [Udoinyion's] wife had changed her mind," and Udoinyion told him "that she had not, and that he should not call again." On June 30, 2005, Reed called and told Udoinyion that "he was making a strong request to tour my house with his client one more time and that his client had money and documents." On this occasion, Udoinyion told Reed that "my wife had not changed her mind" and told him not to call again. On July 2, 2005, Udoinyion received a call from Milling, who told him that she was being sent by Reed for an appointment to tour his house, and that "she was on her way to show my house to a buyer." Udoinyion told Milling that there was no appointment; that he and his wife did not want to do business with Reed or his representative; and that she should not come. On July 7, 2005, Reed called asking about the appointment with Milling and the buyer to tour the house, and Udoinyion told him "my wife and I do not want to do business with him and that he should not call again." Udoinyion stated that he then changed his phone number to prevent further calls from Reed.

In September 2005, Udoinyion and his wife decided to put the house on the market again and hired another Re/Max agent, Laurie Cooper, to show the house. On October 12, 2005, Cooper called Udoinyion and told him that another agent, Reed, had called her and requested a tour of the house for a prospective buyer. Udoinyion told Cooper that he and his wife did not want Reed's business and told her not to send Reed or Milling to the house. On October 17, 2005, Cooper called Udoinyion and told him that she wanted to show the house to a prospective buyer. After Cooper assured Udoinyion that she would not send over Reed or his agent with the buyer, Udoinyion agreed to an appointment to show the house. When the agent and the prospective buyer came to the house on October 18, "[t]he agent presented her Re/Max business card to [Udoinyion] at the door, and [Udoinyion] put it in [his] pocket and let them in." Udoinyion "was surprised when they also had a tape measure and requested to take interior measurements." Udoinyion stated that he reluctantly agreed to allow the measurements, and then saw that "they proceeded to take measurements in the exact same manner as Bill Reed had done with his client the first time." While they were measuring, Udoinyion noticed that "Katie Milling" was the name on the Re/Max card and that "the alleged buyer or client matched the physical description of the buyer who Bill Reed brought to measure the house the first time." Udoinyion asked the agent if she was Katie Milling and if she was sent by Reed, and she answered, "yes." On October 19, 2005, the day after Milling showed the house to the prospective buyer, Udoinyion called Milling "to find out the result of the tour of my house," and Milling told him that she had given all the information to his Re/Max agent, Cooper. Udoinyion then called Cooper, who told Udoinyion that the prospective buyer had made an offer on the house of $220,000. The remainder of Udoinyion's affidavit was not based on his personal knowledge, but consisted of hearsay statements made to Udoinyion by his wife.

Udoinyion also filed an affidavit from his wife opposing summary judgment, which added the following statements:

Udoinyion's wife stated that the house was custom built by her husband, that they put it on the market for an initial price of $248,900, and that "[she] was a living witness to the entire tour of the house by Bill Reed and [the prospective buyer in September 2004,] including but not limited to conversation, measurements, [and] intent to buy." According to Udoinyion's wife, Reed and the buyer "liked the house, and truly wanted to buy it" and "were comfortable with the advertised price of $248,900.00." But she stated that "I did not want them to come back and did not want to do business with them because I did not like their entire conduct of the house tour." She "advised [her husband] to take the house off the market to avoid Bill

Reed and [the prospective buyer] coming back again." She disagreed with her husband's decision to put the house back on the market in September 2005 because she was afraid that Reed might come back again. When she learned from her husband that the prospective buyer brought to the house by Milling on October 18, 2005, had made an offer to buy the house for $220,000, "[t]his further proved that their intention of coming to tour my house was not genuine" because "[t]his offer was contrary to what they said that they were comfortable with the initial advertised price of $248,900.00 and the new advertised price of $251,900.00." Udoinyion's wife added that Reed came to her house with a prospective buyer on December 20, 2005, and requested a tour of the house. She stated that she refused to allow a tour, and that "they stood in front of my house for about 15 minutes and left." Udoinyion's wife stated that "[she] went to stay in the living room with fear till [her] husband came back," and that she "did not want to call the police because [she] was afraid [Reed] might arrange secretly to come and attack me and my family." Finally, Udoinyion's wife stated that Reed came to the house again on February 26, 2006, with another prospective buyer and asked for a tour of the house. She refused and went inside the house "trembling with fear" while "Bill Reed and the person he called client stood there for about 30 minutes and left."

Reed filed an affidavit in support of summary judgment indicating that he continued to call Udoinyion about the house for his client because Udoinyion asked him to keep checking back to see if his wife had changed her mind about selling. Reed denied going to the house in December 2005 or February 2006.

Even accepting the statements made in the affidavits filed by Udoinyion as true, the trial court correctly granted summary judgment in favor of the defendants. OCGA § 9-11-56; *Lau's Corp. v. Haskins*, 261 Ga. 491 (405 SE2d 474) (1991).

As to the claim for trespass, there is no evidence on the present record that Reed, Milling, or Re/Max refused to leave the house or realty after being asked to leave, or that they interfered with Udoinyion's possessory interest in the realty. Accordingly, the trial court correctly found there was no claim for trespass under OCGA § 51-9-1. *Hamil v. Stanford*, 264 Ga. 801, 802 (449 SE2d 118) (1994); *Bullock v. Jeon*, 226 Ga. App. 875-876 (487 SE2d 692) (1997).

As to the claim for invasion of privacy, the several phone calls made by Reed in which he persisted to ask Udoinyion for permission to show the house to prospective buyers was not a sufficient basis for this claim. The tort of invasion of privacy includes claims based on "intrusion upon the plaintiff's seclusion or solitude, or into his private affairs." *Cabaniss v. Hipsley*, 114 Ga. App. 367, 370 (151 SE2d 496) (1966).

> The "unreasonable intrusion" aspect of the invasion of privacy involves a prying or intrusion, which would be offensive or objectionable to a reasonable person, into a person's private concerns. Highly personal questions or demands by a person in authority may be regarded as an intrusion on psychological solitude or integrity and hence an invasion of privacy. However, there are some shocks, inconveniences and annoyances which members of society in the nature of things must absorb without the right of redress.

(Citations and punctuation omitted.) *Yarbray v. Southern Bell Tel. &c. Co.*, 261 Ga. 703, 705 (409 SE2d 835) (1991). The trial court correctly found that Udoinyion's allegations do not constitute such an unreasonable intrusion that they could support a claim for invasion of privacy. Id.

As to the claim for intentional infliction of emotional distress, there must be evidence to establish all of the following elements: (1) the conduct must be intentional or reckless; (2) the conduct must be extreme and outrageous; (3) there must be a causal connection between the wrongful conduct and the plaintiff's emotional distress; and (4) the emotional distress must be severe. *MARTA v. Mosley*, 280 Ga. App. 486, 490-491 (634 SE2d 466) (2006). At a minimum, Udoinyion failed to produce any evidence that the defendants engaged in conduct that was extreme and outrageous, or that he suffered severe emotional distress as a result of the defendants' conduct. To meet the extreme and outrageous test, the conduct "must be so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society." (Citation and punctuation omitted.) *Kaiser v. Tara Ford, Inc.*, 248 Ga. App. 481, 488 (546 SE2d 861) (2001). The conduct must inflict emotional distress "so severe that no reasonable [person] could be expected to endure it." (Citation, punctuation and emphasis omitted.) *Peoples v. Guthrie*, 199 Ga. App. 119, 121 (404 SE2d 442) (1991). The trial court correctly concluded as a matter of law that Udoinyion failed to produce any evidence of conduct by the defendants sufficient to support this claim. *Kaiser*, 248 Ga. App. at 488.

As to the claim for misrepresentation of fact under OCGA § 51-6-2, it is not clear on what basis Udoinyion makes this claim, and he presented no argument and citation of authority on appeal in support of the claim. Accordingly, we deem this claim of error abandoned. Court of Appeals Rule 25 (c) (2).

*Judgment affirmed. Ruffin and Bernes, JJ., concur.*

DECIDED FEBRUARY 12, 2008

*Alan C. Gilmer*, for appellant.
*Berman, Fink & Van Horn, Charles H. Van Horn, Marcy A. Millard*, for appellees.