**Ellenor HONIG, on behalf of herself and all other similarly situated unnamed plaintiffs and on behalf of the general public, Plaintiff,**

v.

**COMCAST OF GEORGIA I, LLC, Comcast Commercial Services, LLC, Comcast Mo Cable Advertising of Metropolitan Atlanta, LLC, and Comcast of Georgia/Virginia, Inc., Defendants.**

Civil Action File No. 1:07–cv–1839–TCB.

United States District Court,
N.D. Georgia,
Atlanta Division.

Jan. 31, 2008.

Edward Adam Webb, Webb & Porter, G. Franklin Lemond, Jr., The Webb Law Group, LLC, Atlanta, GA, for Plaintiff.

David P. Draigh, Jaime A. Bianchi, White & Case, Miami, FL, Jennifer Derelle Fease, Nolan C. Leake, Ryan Scott Ferber, King & Spalding, LLP, Atlanta, GA, for Defendants.

### *ORDER*

TIMOTHY C. BATTEN, SR., District Judge.

## I. *Background*

Defendants (collectively referred to as "Comcast") provide cable television and other services to subscribers throughout the United States, including in the state of Georgia. On November 20, 2006, Comcast installed cable television service at Plaintiff Ellenor Honig's home. She alleges that upon commencement of her service and without her authorization, Comcast charged her $3.25 per month for four consecutive months and $3.40 for an additional month, all for a subscription to a channel guide magazine.[1] Thus, Honig alleges that Comcast charged her $16.40 without her authorization.

Each month the charge was reflected on Honig's bill under the heading "channel guide," but Honig alleges that she assumed that these charges related to the interactive feature that displayed current and future programming on her television when Honig pressed the "guide" button on her Comcast remote control. When she discovered that the charge was instead for the channel guide magazine, she contacted Comcast to cancel the service and seek a refund. Comcast refunded Honig $6.80 of the channel guide charges, leaving her with an actual loss of $9.60.

Presumably unsatisfied, on June 27, 2007, Honig filed this lawsuit against Comcast. She asserts the following claims:[2] (1) deceptive and unlawful business practices under the Georgia Fair Business Practices Act ("GFBPA"), O.C.G.A. § 10–1–390, *et seq.*; (2) trespass to personalty and dispossession of property under O.C.G.A. §§ 51–2–2, 51–10–1, and 51–10–6; (3) breach of contract; (4) unjust enrichment; (5) negligent misrepresentation; and (6) fraudulent misrepresentation, concealment, and failure to disclose.

The main issue in this case is whether Comcast may enforce the arbitration provision set forth in its 2005 subscriber agreement.

In this regard, Comcast states that at the time of the installation, in accordance with its standard operating procedures, it provided Honig with a "welcome kit" that contained its 2005 subscriber agreement, which was the contract that governed the relationship between Comcast and its subscribers at the time Comcast performed Honig's installation. Also at the time of the installation, Comcast provided Honig with a work order describing the work performed and the services that were installed.

Honig and the Comcast representative who installed her service both signed the work order. Immediately to the left of the signature box is the following text:

> By signing this Work Order, I represent that ... the installation, repair or other work provided has been satisfactorily completed. If this Work Order relates to the initial installation of services, I acknowledge receipt of Comcast's Welcome Kit(s) which contain the Comcast subscriber agreement(s), the Comcast

---

1. From a review of Honig's monthly bills, it appears that Comcast increased the charge for the channel guide from $3.25 to $3.40 in the fifth month.

2. Honig asserted these claims in her August 9, 2007, amended complaint.

subscriber privacy notice(s), and other important information about the service(s). I agree to be bound by the Comcast subscriber agreement(s), which constitute the agreement(s) between Comcast and me for the service(s).

Thus, by signing the work order, Honig acknowledged receipt of Comcast's subscriber agreement.

Section 1 of the subscriber agreement states in bold typeface that: "**You will have accepted this Agreement and be bound by is terms if you use Services or otherwise indicate your affirmative acceptance of such Services.**"

Additionally, on the first page of the subscriber agreement, in bold typeface, the following language appears: "**Note: This Agreement contains a binding arbitration provision in Section 13 that affects your rights under this Agreement with respect to all Services.**" In turn, section 13 of the subscriber agreement contains an arbitration provision with various sub-provisions, three of which are central to this case.

First, Section 13b allows either the customer or Comcast to require binding arbitration of:

any dispute, claim or controversy between [the customer] and Comcast regarding any aspect of your relationship with Comcast that has accrued or may hereafter accrue, whether based in contract, statute, regulation, ordinance, tort (including, but not limited to, fraud, misrepresentation, fraudulent inducement, negligence or any other intentional tort), or any other legal or equitable theory . . . .

Second, typed in all capital letters in section 13f under the heading "Restrictions," the arbitration provision contains the following class action waiver, prohibiting claims from being arbitrated on a class-wide basis:

ALL PARTIES TO THE ARBITRATION MUST BE INDIVIDUALLY NAMED. THERE SHALL BE NO RIGHT OR AUTHORITY FOR ANY CLAIMS TO BE ARBITRATED OR LITIGATED ON A CLASS ACTION OR CONSOLIDATED BASIS OR ON BASES INVOLVING CLAIMS BROUGHT IN A PURPORTED REPRESENTATIVE CAPACITY ON BEHALF OF THE GENERAL PUBLIC (SUCH AS A PRIVATE ATTORNEY GENERAL), OTHER SUBSCRIBERS, OR OTHER PERSONS SIMILARLY SITUATED UNLESS THE STATUTE UNDER WHICH YOU ARE SUING PROVIDES OTHERWISE.

Third, typed in all capital letters in section 13c next to the heading "Right to Opt Out," the arbitration provision contains the following opt-out provision:

IF YOU DO NOT WISH TO BE BOUND BY THIS ARBITRATION PROVISION, YOU MUST NOTIFY COMCAST IN WRITING WITHIN 30 DAYS FROM THE DATE THAT YOU FIRST RECEIVE THIS AGREEMENT BY VISITING *WWW. COMCAST.COM/ARBITRATION OPTOUT*, OR BY MAIL TO COMCAST 1500 MARKET ST., PHILADELPHIA, PA 19102 ATTN: LEGAL DEPARTMENT/ARBITRATION. YOUR WRITTEN NOTIFICATION TO COMCAST MUST INCLUDE YOUR NAME, ADDRESS AND COMCAST ACCOUNT NUMBER AS WELL AS A CLEAR STATEMENT THAT YOU DO NOT WISH TO RESOLVE DISPUTES WITH COMCAST THROUGH ARBITRATION. YOUR DECISION TO OPT OUT OF THIS ARBITRATION PROVISION WILL HAVE NO ADVERSE EFFECT ON YOUR RELATIONSHIP WITH COMCAST OR THE DELIVERY OF SERVICES TO YOU BY COMCAST. IF

YOU HAVE PREVIOUSLY NOTIFIED COMCAST OF YOUR DECISION TO OPT OUT OF ARBITRATION, YOU DO NOT NEED TO DO SO AGAIN.

Honig did not notify Comcast that she wished to opt out of the arbitration provision within thirty days of acknowledging receipt of the subscriber agreement on November 20, 2006, or at any time thereafter.

Also notable, the arbitration provision gives the subscriber several rights that make the arbitration process more flexible and less costly for subscribers than most arbitration proceedings. For example, a subscriber may choose between two different arbitration services: the American Arbitration Association or the National Arbitration Forum. Upon written request, the subscriber may also require Comcast to advance the filing fees and costs of the arbitration (other than the subscriber's own attorney and expert witness fees). A subscriber who prevails at arbitration has no obligation to reimburse Comcast for these advanced fees and costs. Even if the subscriber does not prevail, he or she is obligated only to reimburse Comcast for the amount the subscriber would have paid to file the claim in a state court of the state where the subscriber receives cable television service.

Comcast now moves to compel arbitration of this dispute based upon the arbitration provision in the subscriber agreement. Honig opposes Comcast's motion, raising several arguments that the Court will now address in turn.

## II. *Discussion*

### A. *Whether the Parties Agreed to Arbitrate This Dispute*

Honig first argues that she did not agree to arbitrate her claims against Comcast.

The Federal Arbitration Act ("FAA") provides that a written arbitration "provision in any ... contract evidencing a transaction involving commerce ... shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The effect of Section 2 of the FAA is to "create a body of federal substantive law of arbitrability, applicable to any arbitration agreement within the coverage of the Act." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983). Thus, a district court must compel arbitration and stay the underlying action if the parties had an earlier agreement to arbitrate their dispute. 9 U.S.C. § 3; *see also Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218, 105 S.Ct. 1238, 84 L.Ed.2d 158 (1985) ("By its terms, the [FAA] leaves no place for the exercise of discretion by a district court, but instead mandates that district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed.").

■ Indeed, the FAA establishes a "federal policy favoring arbitration" and requires that courts "rigorously enforce agreements to arbitrate." *Shearson/Am. Express, Inc. v. McMahon*, 482 U.S. 220, 226, 107 S.Ct. 2332, 96 L.Ed.2d 185 (1987) (citations omitted). Accordingly, arbitration clauses are to be generously construed in favor of arbitration. *Moses*, 460 U.S. at 24, 103 S.Ct. 927; *see also Blinco v. Green Tree Servicing LLC*, 400 F.3d 1308, 1311 (11th Cir.2005) (noting "unquestionably strong federal policy favoring arbitration").

■ Notwithstanding the strong federal policy favoring arbitration, no one can be forced to submit a dispute to arbitration that she did not agree to arbitrate. *Kemiron Atl., Inc. v. Aguakem Int'l, Inc.*, 290 F.3d 1287, 1290 (11th Cir.2002). Although

the validity of an arbitration agreement is generally governed by the FAA, state law generally governs whether an enforceable contract or agreement to arbitrate exists. *Caley v. Gulfstream Aerospace Corp.*, 428 F.3d 1359, 1367–68 (11th Cir.2005). In determining whether a binding agreement to arbitrate arose between the parties, the court must apply the state law governing the formation of a contract. *Id.* at 1368. However, as the FAA is "preemptive of state laws hostile to arbitration," the court should take into consideration the federal policy favoring arbitration. *Id.* at 1367–68 (quoting *Circuit City v. Adams*, 532 U.S. 105, 112, 121 S.Ct. 1302, 149 L.Ed.2d 234 (2001)).

█ It is undisputed that the subscriber agreement, which contains the arbitration provision, is a contract "evidencing a transaction involving commerce" and therefore is governed by the FAA. *See* 9 U.S.C. § 2. It is also undisputed that the claims asserted by Honig fall within the scope of the arbitration provision.

Honig argues, however, that she does not recall having received the welcome kit that contained the 2005 subscriber agreement and therefore maintains that a jury question exists on this issue. Honig points out that the FAA provides that "if the making of the arbitration agreement . . . be in issue . . . the party alleged to be in default [may] . . . demand a jury trial of such issue." 9 U.S.C. § 4.

█ The Court rejects Honig's argument. The Eleventh Circuit has made clear that to warrant a jury trial, a party seeking to avoid arbitration "must unequivocally deny that an agreement to arbitrate was reached and must offer 'some evidence' to substantiate the denial." *Wheat, First Sec., Inc. v. Green*, 993 F.2d 814, 817 (11th Cir.1993). Importantly, "a party cannot place the making of the arbitration agreement in issue simply by opining that no agreement exists. Rather,

that party must substantiate the denial of the contract with enough evidence to make the denial colorable." *Chastain v. Robinson–Humphrey Co.*, 957 F.2d 851, 855 (9th Cir.1992).

Although Honig denies that she agreed to arbitrate her claims, she offers no evidence to substantiate this denial. She has not submitted to the Court an affidavit or a declaration, but instead relies solely upon a conclusory statement in her brief that she does not remember receiving the welcome kit and thus could not have read or agreed to the arbitration provision in the subscriber agreement.

By contrast, Comcast offers the sworn declaration of James Macke, its director of government and community affairs, who states that it was Comcast's standard practice at the time to provide new subscribers with a welcome kit. According to Macke, the Comcast employee installing the service would hand-deliver the welcome kit to the subscriber. The customer would then sign a work order that confirmed the installation and acknowledged receipt and acceptance of the welcome kit and the service agreement it contained. To confirm that this practice was carried out in this case, Comcast submits the work order that Honig signed in which she acknowledged receipt of the welcome kit and agreed to be bound by the subscriber agreement that contains the arbitration provision.

█ Because Honig has not proffered any evidence on this issue, Comcast's evidence regarding her receipt of the subscriber agreement stands uncontroverted. Additionally, because Honig accepted Comcast's cable service by paying for it and receiving its benefits without any objection, she is also bound by the arbitration provision under well established Georgia law that valid contracts, including contracts containing arbitration clauses, may be formed by a party's continued use

or acceptance of services without objection. *See, e.g., Comvest, L.L.C. v. Corp. Sec. Group, Inc.,* 234 Ga.App. 277, 280, 507 S.E.2d 21, 24–25 (1998) ("Parties may be bound by the terms of a contract, even though they do not sign it, where their assent is otherwise indicated, such as by the acceptance of benefits under the contract, or the acceptance by one of the performance by the other") (citations omitted); *Athon v. Direct Merchants Bank,* No. 5:06–cv–1, 2007 WL 1100477, at *4 (M.D.Ga. Apr. 11, 2007) ("[U]nder Georgia law, the parties to an arbitration agreement may demonstrate their assent to be bound by the agreement by acting upon or accepting benefits under the contract containing the arbitration agreement").

■ For these reasons, the Court finds that as a matter of law the parties agreed to arbitrate this dispute. *Accord Rivera v. AT & T Corp.,* 420 F.Supp.2d 1312, 1320–21 (S.D.Fla.2006) (plaintiffs bare denial of receipt of arbitration agreement was insufficient to send arbitrability question to a jury).[3]

■ Next, Honig argues that even if she did agree to arbitrate her claims, any such agreement ended when she terminated her contractual relationship with Comcast prior to filing this lawsuit. Relying upon *Crystal Blue Granite Quarries, Inc. v. McLanahan,* 261 Ga. 267, 404 S.E.2d

266 (1991), Honig asserts that under Georgia law a party is not bound by an arbitration provision upon the expiration of the agreement containing the arbitration provision. She further contends that although the arbitration provision states that it "shall survive the termination of your Service(s) with Comcast," such a provision is unenforceable because it is unreasonable.

Honig's argument is without merit, and her reliance on *Crystal Blue Granite Quarries* is misplaced. In *Crystal Blue,* the Georgia Supreme Court did refuse to apply an arbitration clause, but in that case the dispute arose *after* the expiration of the contract containing the arbitration clause. *Id.* at 267–68 (deciding that the lease in question had not been renewed and therefore the arbitration clause could not be applied to a dispute arising from an event occurring after the lease term). Here, it is uncontested that the dispute arose while the subscriber agreement was still in effect—*before* Honig voluntarily terminated her service. As for Honig's contention that the survival clause is unreasonable, she cites no authority to support this argument and the Court therefore rejects it.

**B.** ***Whether the Arbitration Provision Is Enforceable***

■ Even if Honig agreed to arbitrate this dispute, she argues that the

---

**3.** Honig argues that the Court should allow for discovery "as to whether Plaintiff and the members of the proposed [nationwide] Class agreed to arbitrate their claims" and "whether any such agreements are enforceable." However, she cites no authority in the arbitration context that requires the Court to permit this type of discover. Moreover, she fails to demonstrate that this discovery is necessary; it is undisputed that she signed the work order and failed to exercise her right to opt out of the arbitration provision. Finally, allowing such discovery would contravene the policy of the FAA that issues of arbitrability should be determined promptly. *See Moses,*

460 U.S. at 29, 103 S.Ct. 927. Consequently, the Court declines to grant Honig's discovery request. *Accord Bank One, N.A. v. Coates,* 125 F.Supp.2d 819, 828–29 (S.D.Miss.2001) ("it does not follow from the fact that the defendant takes the position that he did not agree to arbitration that discovery is necessary to determine whether" there was an agreement to arbitrate); *Cole v. Halliburton Co.,* No. CIV–00–0862–T, 2000 WL 1531614, at *1–3 (W.D.Okla. Sept. 6, 2000) (granting motion to compel arbitration and refusing discovery on whether the plaintiff received notice of arbitration provision).

arbitration provision is unenforceable because it contains a class action waiver.[4] As explained earlier, in all capital letters in section 13f under the heading "Restrictions," the arbitration provision contains the following class action waiver:

ALL PARTIES TO THE ARBITRATION MUST BE INDIVIDUALLY NAMED. THERE SHALL BE NO RIGHT OR AUTHORITY FOR ANY CLAIMS TO BE ARBITRATED OR LITIGATED ON A CLASS ACTION OR CONSOLIDATED BASIS OR ON BASES INVOLVING CLAIMS BROUGHT IN A PURPORTED REPRESENTATIVE CAPACITY ON BEHALF OF THE GENERAL PUBLIC (SUCH AS A PRIVATE ATTORNEY GENERAL), OTHER SUBSCRIBERS, OR OTHER PERSONS SIMILARLY SITUATED UNLESS THE STATUTE UNDER WHICH YOU ARE SUING PROVIDES OTHERWISE.

Honig asserts that this type of class action waiver is unconscionable under Georgia law, thereby rendering the entire arbitration provision unenforceable in light of the fact that the arbitration provision states that "[i]f the class action waiver clause is found to be illegal or unenforceable, the entire Arbitration Provision will be unenforceable, and the dispute will be decided by a court."

"The FAA allows state law to invalidate an arbitration agreement, provided the law at issue governs contracts generally and not arbitration agreements specifically." *Bess v. Check Express*, 294 F.3d 1298, 1306 (11th Cir.2002). *See Doctor's Assocs., Inc. v. Casarotto*, 517 U.S. 681, 686–87, 116 S.Ct. 1652, 134 L.Ed.2d 902 (1996) ("generally applicable contract defenses, such as fraud, duress, or unconscionability, may be applied to invalidate arbitration agreements"). Georgia law recognizes and protects the freedom of parties to contract. *NEC Techs, v. Nelson*, 267 Ga. 390, 396, 478 S.E.2d 769, 774 (1996). This is true even though a party may enter a contract that is so unreasonable or that may lead to hardship. *Id.* However, under Georgia law, a contract may also be viewed as so one-sided so as to render it unconscionable and unenforceable. *Id.*

"[T]he basic test for determining unconscionability is 'whether, in light of the general commercial background and the commercial needs of the particular trade or case, the clauses involved are so one-sided as to be unconscionable under the circumstances existing at the time of the making of the contract.'" *Id.* at 391, 478 S.E.2d at 771. Georgia law recognizes both procedural and substantive unconscionability. "Procedural unconscionability addresses the process of making the contract, while substantive unconscionability looks to the contractual terms themselves." *Id.* at 392, 478 S.E.2d at 771. In determining procedural unconscionability, Georgia courts look to the following factors: "age, education, intelligence, business acumen and experience of the parties, their relative bargaining power, the conspicuousness and comprehensibility of the contract language, the oppressiveness of the terms, and the presence or absence of meaningful choice." *Id.* at 392, 478 S.E.2d at 771–72. To determine substantive unconscionability, courts focus on "matters

---

4. Honig further contends that the arbitration provision is an invalid prelitigation denial of the right to jury trial under Georgia law and that the Georgia Arbitration Act prohibits arbitration of consumer disputes. Because the FAA preempts the Georgia Arbitration Act, these arguments are meritless. *See Doctor's Assocs. v. Casarotto*, 517 U.S. 681, 682, 116 S.Ct. 1652, 134 L.Ed.2d 902 (1996); *see also In re Pate*, 198 B.R. 841, 845 (Bankr.N.D.Ga. 1996) (because the FAA preempts the GAA, the arbitration clause was enforceable notwithstanding the GAA's prohibition on arbitration of consumer disputes).

such as the commercial reasonableness of the contract terms, the purpose and effect of the terms, the allocation of the risks between the parties, and similar public policy concerns." *Id.* at 392, 478 S.E.2d at 772.

Honig argues that if the class action waiver is enforced, she and members of the proposed class will be denied meaningful relief with respect to Comcast's alleged practice of charging subscribers for a channel guide magazine without their authorization. Specifically, she explains that because the channel guide magazine service costs at the most $3.40 per month, the actual damages of each member of the proposed class are small. Because of the negligible amount of recovery compared to the cost of going to arbitration, she argues that obtaining meaningful relief for her and the proposed class is virtually impossible if they cannot avail themselves of the class action procedure.

 To advance this argument, Honig relies principally upon the Eleventh Circuit's recent decision in *Dale v, Comcast Corp.*, 498 F.3d 1216 (11th Cir.2007).[5] In *Dale*, two of Comcast's television subscribers filed a putative class action against the company, alleging that it charged them excessive franchise fees in violation of the Cable Communications Policy Act, 47 U.S.C. § 521 *et seq.* (the "Cable Act"). Comcast sought to compel arbitration of the dispute based upon the arbitration provision in its subscriber agreement. Like the case at bar, the arbitration provision contained a class action waiver, and the

plaintiffs argued that the waiver was unconscionable.

The Eleventh Circuit agreed with the plaintiffs, reasoning that "without the benefit of a class-action mechanism, the subscribers would effectively be precluded from suing Comcast for a violation of [the Cable Act] because of the difficulty a single subscriber would have in obtaining legal representation in light of the small amount of damages at issue and the Cable Act's lack of a fee-shifting provision." *Dale*, 498 F.3d at 1224. The result, the court concluded, would "allow Comcast to engage in unchecked market behavior that may be unlawful. Corporations should not be permitted to use class action waivers as a means to exculpate themselves from liability for small-value claims." *Id.*

At first glance, *Dale* appears to strongly support Honig's position. However, a closer reading of *Dale* reveals that the Eleventh Circuit expressly limited the holding *of Dale*, and its facts are distinguishable from the facts of this case.

In this regard, it is first important to understand that *Dale* did not categorically hold that all class action waivers in arbitration provisions are unconscionable. Rather, the Eleventh Circuit made clear that whether a class action waiver is enforceable depends entirely upon the unique facts and circumstances of the case. As the Eleventh Circuit put it, "the enforceability of a particular class action waiver in an arbitration agreement must be determined on a case-by-case basis, considering the

---

**5.** Dale was decided after Comcast filed its motion to compel arbitration but before Honig's response thereto. Because of the timing of the Dale decision, Honig filed a motion for leave to file a surreply brief so that she could more fully brief the Dale decision. The Court grants Honig's motion because receiving fully briefed arguments and responses interpreting a new and relevant case such as this one is a

valid reason for granting leave to file a surreply. See *Fedrick v. Mercedes–Benz USA, LLC*, 366 F.Supp.2d 1190, 1197 (N.D.Ga.2005) (noting that although neither the Federal Rules of Civil Procedure nor the Court's local rules authorize the filing of surreplies, "the Court may in its discretion permit the filing of a surreply ... where a valid reason for such additional briefing exists....").

totality of the facts and circumstances." *Id.*

Importantly, in several cases prior to *Dale,* the Eleventh Circuit upheld the enforceability of class action waivers in arbitration agreements. *See Caley v. Gulfstream Aerospace Corp.,* 428 F.3d 1359 (11th Cir.2005) (upholding arbitration provision that contained class action waiver in employer-employee dispute resolution policy in a discrimination case); *Jenkins v. First Am. Cash Advance of Ga., LLC,* 400 F.3d 868 (11th Cir.2005) (holding arbitration provision that contained class action waiver was not unconscionable in a case involving allegations of usury and racketeering); *Randolph v. Green Tree Fin. Corp.,* 244 F.3d 814 (11th Cir.2001) (upholding class action waiver in arbitration agreement even though it precluded the plaintiffs from utilizing class action procedure in vindicating their statutory rights under the Truth in Lending Act).

These decisions recognized that the unavailability of certain procedures in arbitration, such as class procedures, demonstrates the advantages of arbitration, which "trades the procedures and opportunity for review of the courtroom for the simplicity, informality, and expedition of arbitration." *Gilmer v. Interstate/Johnson Lane Corp.,* 500 U.S. 20, 31, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991) (quoting *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.,* 473 U.S. 614, 628, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985)). Thus, it is vital to understand *Dale* in light of the entire body of Eleventh Circuit case law on this issue. With the exception of *Dale,* the Eleventh Circuit has upheld class action waivers in arbitration agreements.

So what made *Dale* different from *Caley, Jenkins,* and *Randolph?* In *Dale,* unlike the other cases that preceded it, the plaintiffs filed suit under the Cable Act, a statute that did not contain an automatic fee-shifting provision that would allow the plaintiffs to recover attorney's fees if they prevailed. In this situation, the Eleventh Circuit expressed concern that enforcement of the class action waiver would contravene public policy because there would be little or no incentive for a lawyer to bring an individual subscriber's claims in light of the small amount of damages each subscriber sought.

In addition to their claim under the Cable Act, the plaintiffs in *Dale* also asserted state law claims for unjust enrichment and money had and received. The court recognized that the plaintiffs could recover attorney's fees and expenses in connection with these claims pursuant to O.C.G.A. § 13–6–11 if they could show that Comcast acted in bad faith. Nevertheless, the court held that the potential recovery of fees and expenses under that statute did not provide the same incentive to an attorney as an automatic or likely award of fees and costs. *See Dale,* 498 F.3d at 1223.

The Eleventh Circuit distinguished its earlier cases of *Caley, Jenkins,* and *Randolph,* noting that in those cases the prevailing plaintiffs had an automatic or likely recovery of attorney's fees under a fee-shifting provision in the statute under which they sued, thereby giving an attorney an incentive to arbitrate such small-value claims on an individual basis. The end result was that in *Caley, Jenkins,* and *Randolph,* there was no danger that the defendant's alleged illegal conduct would go unchecked.

The case at bar is more analogous to *Caley, Jenkins,* and *Randolph* than to *Dale.* The first and primary claim stated in Honig's complaint is brought pursuant to the Georgia Fair Business Practices Act, which, unlike the Cable Act, does contain a fee-shifting provision that guarantees the prevailing plaintiff the right to recover attorney's fees and costs. See O.C.G.A. § 10–1–399(d) (person injured by violation

of the GFBPA shall be awarded reasonable attorney's fees and expenses, "irrespective of the amount in controversy").

Honig argues that her other state law claims (trespass, breach of contract, unjust enrichment, negligent misrepresentation, and fraudulent misrepresentation) do not provide for such automatic fee-shifting. However, a fair reading of Honig's complaint reveals that these other theories are largely duplicative and derivative of her main claim that Comcast violated the GFBPA.

Moreover, Honig is only partially correct with respect to how fee-shifting operates in connection with her state law claims. It is true that Honig can recover attorney's fees and expenses in connection with her breach of contract, unjust enrichment, and negligent misrepresentation claims pursuant to O.C.G.A. § 13–6–11 only if she can show that Comcast acted in bad faith. Thus, Honig merely has the potential to recover attorney's fees in connection with these claims, and to ensure such recovery, the burden will be on her to show that Comcast acted in bad faith.

By contrast, Honig has a high likelihood of recovering attorney's fees and expenses in connection with her trespass and fraud claims. This is because Georgia courts have held that "[e]very intentional tort invokes a species of bad faith that entitles a person wronged to recover the expenses of litigation including attorney fees" pursuant to O.C.G.A. § 13–6–11. *See DeKalb County v. McFarland*, 231 Ga. 649, 651, 203 S.E.2d 495, 499 (1974); *see also Todd v. Byrd*, 283 Ga.App. 37, 48, 640 S.E.2d 652, 661 (2006). Obviously, Honig's tres-

pass and fraud claims are intentional tort claims. Thus, unlike her other state law claims where bad faith will need to be proven to entitle her to recovery of fees and expenses under O.C.G.A. § 13–6–11, if she prevails on her trespass and fraud claims, Comcast's bad faith will be presumed and an award of fees is therefore highly likely.[6]

Honig further asserts that in both *Caley* and *Randolph*, all of the claims brought by the plaintiffs provided for the automatic recovery of attorney's fees, whereas not all of her claims do so. However, she fails to point out that in *Jenkins*, the court faced the same situation; although the plaintiff could automatically recover attorney's fees under the Georgia RICO statute if she prevailed, she could not do so with respect to her claims under Georgia's usury statutes.

The Court finds that because Honig may automatically recover attorney's fees on her central claim under the GFBPA and because she is highly likely to do so on two of her four state law claims, the concerns that were implicated in *Dale* are not present in this case. Honig's ability to recover attorney's fees on most of her claims if she prevails provides an attorney ample incentive to represent her and pursue all of her claims in arbitration.

Furthermore, as noted earlier, Comcast has agreed to advance the filing fees and costs of the arbitration. A subscriber who prevails at the arbitration has no obligation to reimburse Comcast for these advanced fees and costs. And even if the subscriber does not prevail, she is obligat-

---

**6.** It is highly likely rather than automatic because the language authorizing fees and expenses in O.C.G.A. § 13–6–11 is permissive, thereby giving the fact-finder discretion as to whether to award fees and expenses. *See Multimedia Techs., v. Wilding*, 262 Ga.App. 576, 581, 586 S.E.2d 74, 80 (2003). This

stands in contrast to the fee-shifting provision under the GFBPA which by its terms is mandatory. *See* O.C.G.A. § 10–1–399(d) (person injured by violation of the GFBPA "shall" be awarded reasonable attorney's fees and expenses).

ed to reimburse Comcast only the amount she would have paid to file the claim in a state court of the state in which she receives cable television service.

Moreover, the Court also finds it highly significant that by its very terms, the GFBPA prohibits consumer class actions. *See* O.C.G.A. § 10–1–399(a); *see also Friedlander v. PDK Labs, Inc.,* 266 Ga. 180, 465 S.E.2d 670, 671 (1996) ("A person who suffers injury or damages, or whose business or property has been injured or damaged, as a result of consumer acts or practices may bring an action under the FBPA individually, but not in a representative capacity") (citations omitted).

In essence, Honig's argument in this case rests upon public policy, namely, that class action waivers should be struck down so that consumers can better vindicate their rights. While this argument has appeal, it is undercut by the fact that the GFBPA expressly prohibits consumer class actions. It is inconceivable that precluding class-wide relief is against public policy when the Georgia legislature expressly excluded this avenue of relief under the GFPBA, the principal statute under which Honig seeks relief.

Indeed, other courts have enforced class action waivers in similar circumstances, i.e., where the statute under which the plaintiff sought relief disallowed class actions. *See, e.g., Iberia Credit Bureau v. Cingular Wireless LLC,* 379 F.3d 159, 174–75 (5th Cir.2004) (finding prohibition on class actions in Louisiana's Unfair Trade Practices Act to be a highly relevant factor in enforcing class action waiver provision in arbitration provision); *O'Quin v.*

*Verizon Wireless,* 256 F.Supp.2d 512, 520 (M.D.La.2003) ("Plaintiffs policy reason for finding the arbitration agreement unenforceable because it precludes class actions have essentially been considered by Louisiana's legislature and rejected when the legislature declined to permit class actions under the Louisiana Unfair Trade Practices Act").

■ Finally, and most importantly, in contrast to *Dale* and even the prior Eleventh Circuit cases that upheld class action waivers, Honig was free to reject the terms of the arbitration provision without a single adverse consequence.[7] Specifically, the arbitration provision gave her the right to opt out within thirty days without adversely affecting her cable service, but she never exercised this right. Honig's ability to opt out of the arbitration provision dilutes her unconscionability argument because the provision was not offered on a take-it-or-leave-it basis. Courts have stressed the importance of such opt-out provisions in enforcing class action waivers in arbitration agreements. *See, e.g., Sanders v. Comcast Cable Holdings, LLC,* No. 3:07–cv–918–J–33HTS (M.D.Fla. Jan. 14, 2008) (holding class action waiver provision was not unconscionable where arbitration provision allowed subscribers to opt out); *Davidson v. Cingular Wireless LLC,* No. 2:06cv00133, 2007 WL 896349, at *6 (E.D.Ark. Mar. 23, 2007) (class action waiver in contract for cell phone service not unconscionable where plaintiff failed to opt out; such form contracts are "integral part of modern commerce").

---

7. Honig argues in passing that it is unclear whether the opt-out provision in fact permitted her to opt out of the class action waiver provision or instead merely permitted her to opt out of the arbitration procedure. Given that the class action waiver is a sub-provision within the arbitration provision, the ability to opt out of the arbitration provision necessarily allows one to opt out of the class action waiver. At bottom, Honig's argument cannot be squared with the plain language of the terms of the subscriber agreement.

For all of these reasons, the Court rejects Honig's argument that the class action waiver is unconscionable.

### III. Conclusion

For the foregoing reasons, the Court GRANTS Defendant's motion to compel arbitration [8] and GRANTS Plaintiff's motion for leave to file a surreply brief [31]. This action is STAYED pursuant to 9 U.S.C. § 3, and the CLERK is DIRECTED to ADMINISTRATIVELY CLOSE this case.[8]

---

8. Administratively closing a case is a docket control device used by the Court for statistical purposes and does not prejudice the rights of the parties to this litigation in any manner.