**FIFTH DIVISION**
**MILLER, P. J.,**
**MERCIER and COLVIN, JJ.**

**NOTICE: Motions for reconsideration must be _physically received_ in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

_DEADLINES ARE NO LONGER TOLLED IN THIS COURT. ALL FILINGS MUST BE SUBMITTED WITHIN THE TIMES SET BY OUR COURT RULES._

**May 17, 2021**

# In the Court of Appeals of Georgia

A21A0131. THORNTON v. UBER TECHNOLOGIES, INC. et al.

COLVIN, Judge.

After a driver for Uber Technologies, Inc. ("Uber"), murdered Ryan Thornton in 2018, his mother ("Appellant") filed this action for wrongful death and negligence. Appellant now brings this interlocutory appeal from the trial court's order compelling arbitration. On appeal, Appellant argues that the trial court erred by finding that, as a matter of law, her son assented to an arbitration agreement contained in Uber's terms and conditions. For the following reasons, we reverse the trial court's order and remand for proceedings consistent with this opinion.

> Whether a valid and enforceable arbitration agreement exists is a question of law for the court. OCGA § 13-2-1. We therefore review a trial court's order granting or denying a motion to compel arbitration de novo. The appellees, as the parties seeking arbitration, bear the burden

of proving the existence of a valid and enforceable agreement to arbitrate. And the validity of an arbitration agreement is generally governed by state law principles of contract formation.

(Citations and punctuation omitted.) *McKean v. GGNSC Atlanta, LLC*, 329 Ga. App. 507, 509 (1) (765 SE2d 681) (2014).

The record shows that Uber is a technology company that develops software applications ("apps") for transportation and food delivery services. To use Uber's services, an individual must download the Uber app on his smartphone and create an account with Uber. When creating an Uber account on a smartphone, the app directs a user to a screen on which the user is prompted to provide contact information and a password for the account. The next step of the account registration process directs the user to a payment screen where the user is prompted to input his payment information.

The version of the Uber app at issue in this case prompted a user to either enter his credit card information or link his PayPal account. The top portion of the payment screen contains fields for the user to input his credit card information. The middle portion of the screen contains a button labeled "Register" and a button to link a PayPal account. Underneath the two buttons, near the bottom of the screen, small,

dark gray text reads "BY CREATING AN UBER ACCOUNT, YOU AGREE TO OUR TERMS & CONDITIONS AND PRIVACY POLICY." The words "TERMS & CONDITIONS AND PRIVACY POLICY" are presented as a hyperlink in blue, underlined text. If clicked on, a user would be directed to a document containing Uber's terms and conditions for users of its services. The terms and conditions explain that a user is entering into a contract with Uber and is bound by the terms and conditions through the user's access and use of Uber's services. Uber's terms and conditions contain an arbitration clause, under which the user agrees to settle any disputes arising out of the use of Uber's services.

Appellant presented evidence that a user on a smartphone with an Android operating system experienced an on-screen keyboard appearing at the bottom of the screen when they clicked on the information field at the top of the payment screen to enter a credit card number. In that circumstance, the on-screen keyboard concealed the text and hyperlink informing the user of Uber's terms and conditions but did not conceal the "Register" button.

Uber's records reflect that Thornton created an account using his smartphone with an Android operating system on May 15, 2016, and that he entered credit card information as his form of payment. Thornton began using Uber's services in July

3

2016. In an affidavit, an Uber paralegal averred that Uber sent an email on November 22, 2016 to inform Thornton that it had updated the terms and conditions associated with the use of its services, including portions of the arbitration agreement. After November 2016, Thornton used Uber's services 41 more times.

After his death, Appellant, as Thornton's surviving parent, filed suit for wrongful death and various claims of negligence against Uber. Uber filed a joint motion to dismiss and motion to compel arbitration, requesting that the trial court enforce the arbitration clause contained in its terms and conditions. The trial court granted the motion to compel arbitration and stayed the case, finding that Thornton had assented to Uber's arbitration clause contained in its terms and conditions. Appellant then sought and we granted interlocutory review of the trial court's order.

1. Appellant argues that the trial court erred by finding that Thornton assented to Uber's terms and conditions when the terms were inconspicuous and concealed by the onscreen keyboard. Because questions of fact remain on whether the on-screen keyboard concealed the terms and conditions, we agree.

"The consent of the parties being essential to a contract, until each has assented to all the terms, there is no binding contract[.]" OCGA § 13-3-2.

In determining whether there was a mutual assent, courts apply an objective theory of intent whereby one party's intention is deemed to be that meaning a reasonable man in the position of the other contracting party would ascribe to the first party's manifestations of assent, or that meaning which the other contracting party knew the first party ascribed to his manifestations of assent. Further, in cases such as this one, the circumstances surrounding the making of the contract, such as correspondence and discussions, are relevant in deciding if there was a mutual assent to an agreement. Where such extrinsic evidence exists and is disputed, the question of whether a party has assented to the contract is generally a matter for the jury.

(Citations omitted.) *Turner Broadcasting System v. McDavid*, 303 Ga. App. 593, 597 (1) (693 SE2d 873) (2010) (affirming the denial of a motion for j.n.o.v. where "[t]he evidence on the issue of contract formation was highly controverted and presented genuine issues of fact for the jury's resolution").

(a) Appellant argues that Uber's terms and conditions were so inconspicuous on the payment screen that Thornton could not have reasonably assented to the terms as a matter of law. We disagree.

Where one who can read signs a contract without apprising himself of the contents, otherwise than by accepting representations made by the opposite party, with whom there exists no fiduciary or confidential relation, he cannot defeat an action based on it, or have it canceled or

5

reformed, on the ground that it does not contain the contract actually made, unless it should appear that at the time he signed it some such emergency existed as would excuse his failure to read it, or that his failure to read it was brought about by some misleading artifice or device perpetrated by the opposite party, amounting to actual fraud such as would reasonably prevent him from reading it.

(Citation and punctuation omitted.) *Lovelace v. Figure Salon*, 179 Ga. App. 51, 52 (1) (345 SE2d 139) (1986).

The question of assent to a smartphone app's terms and conditions is an issue of first impression for this Court, but cases from other jurisdictions are instructive. Applying California law, which requires conspicuous notice of terms of an agreement, the United States Court of Appeals for the Second Circuit found that a user manifested his assent to an arbitration agreement in a similar version of the Uber app, where the language regarding the terms and conditions appeared on the payment screen "in a small font" and "the dark print contrast[ed] with the bright white background, and the hyperlinks [were] in blue and underlined." (Footnote omitted.) *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 78 (I) (B) (1), 80 (I (B) (2) (2d Cir. 2017) (user assented to Uber's terms of service where "the Payment Screen provided clear notice that there were terms that governed [a continuing] relationship"). But compare

6

*Cullinane v. Uber Techs., Inc.*, 893 F.3d 53, 63-64 (IV) (1st Cir. 2018) (under Massachusetts law, no assent to Uber's terms of service where terms were "displayed in a dark gray small-sized non-bolded font against a black background" and the "hyperlink did not have the common appearance of a hyperlink"). In its ruling, the *Meyer* Court observed that "a reasonably prudent smartphone user knows that text that is highlighted in blue and underlined is hyperlinked to another webpage where additional information can be found" such that the "reasonably prudent smartphone user would have constructive notice of" the hyperlinked terms and conditions–including the arbitration clause. Id. at 78-79 (I) (B) (1).

Here, the top of the payment screen directs a registrant to enter his payment information. At the bottom of the payment screen with a white background, a statement in small, dark gray font reads "BY CREATING AN UBER ACCOUNT, YOU AGREE TO OUR TERMS & CONDITIONS AND PRIVACY POLICY." The language "Terms & Conditions and Privacy Policy" is presented as a blue, underlined hyperlink.[1] These terms are clear against the white background and the blue hyperlink

---

[1] This type of agreement, known as a browsewrap agreement, "does not require the user to manifest assent to the terms and conditions expressly[.]" (Citation and punctuation omitted.) *Hines v. Overstock.com, Inc.*, 668 F.Supp.2d 362, 366 (I) (E.D. N.Y. 2009) ("On the internet, the primary means of forming a contract are the so-called 'click-wrap' (or 'click-through') agreements, in which website users typically

draws attention to the terms and conditions, such that a reasonable smartphone user would know that more information would be found if he clicked upon the hyperlink. Because failure to read does not excuse a party's obligations under a contract, under the objective standard of assent, Thornton could have been bound by Uber's terms and conditions after registering his account. See *McDavid,* 303 Ga. App. at 597 (1); *Lovelace*, 179 Ga. App. at 52 (1).

(b) Even if Thornton's assent to Uber's terms and conditions could have been established through the registration process, Appellant argues that the trial court erred in finding assent as a matter of law because the potential concealment of the terms and conditions by the on-screen keyboard raises a question of fact. We agree.

Under Georgia's objective theory of intent, Thornton cannot have assented to Uber's terms and conditions if he never had the opportunity to see them. Not only has Uber acknowledged that Thornton used a credit card instead of Paypal when registering for the Uber app, its counsel also conceded that the keyboard "may have momentarily covered" the text with the link to the terms and conditions. This

click an 'I agree' box after being presented with a list of terms and conditions of use, and the 'browsewrap' agreements, where website terms and conditions of use are posted on the website typically as a hyperlink at the bottom of the screen") (citation omitted).

8

evidence raises questions of whether the on-screen keyboard concealed the text so that the terms and conditions were either never displayed or displayed for an unreasonably short amount of time such that Thornton would not have seen them. Because these questions of material fact remain, the trial court erred by finding that Thornton assented to the arbitration agreement as a matter of law. See *McDavid,* 303 Ga. App. at 597 (1); *Murphy v. Hosanna Youth Facilities, Inc.*, 683 F.Supp.2d 1304, 1312-1315 (II-III) (N.D. Ga. 2010) (denying motions to compel arbitration and for summary judgment because issues of material fact pertaining to assent by an agent required a jury determination).

2. Uber argues that, even if Thornton did not assent to the terms and conditions upon registration, his continued use after Uber sent him an email updating its terms and conditions constitutes assent. We disagree because a question of fact exists regarding whether Thornton received the updated terms and conditions.

"[V]alid contracts, including contracts containing arbitration clauses, may be formed by a party's continued use or acceptance of services without objection." (Citations omitted.) *Honig v. Comcast of Ga. I, LLC*, 537 F.Supp.2d 1277, 1283-84 (II) (A) (N.D. Ga. 2008) (user assented to arbitration clause where cable subscriber agreement was handed to user upon installation and user continued to use cable

9

services), citing *Comvest, LLC v. Corp. Sec. Group, Inc.*, 234 Ga. App. 277, 280 (3) (507 SE2d 21) (1998) ("Parties may become bound by the terms of a contract, even though they do not sign it, where their assent is otherwise indicated, such as by the acceptance of benefits under the contract, or the acceptance by one of the performance of the other") (punctuation and footnote omitted).

In *Comvest*, a securities group and an investment company entered into agreement to sell stock at an initial public offering. *Comvest*, 234 Ga. App. at 278. The securities group opened an account for the investment company and subsequently mailed a customer agreement containing an arbitration provision to the president of the investment company. Id. Although the president of the investment company did not sign and return the customer agreement to the securities group, this Court found that the investment company assented to the arbitration provision through its continued performance under the agreement. Id. at 280 (3).

The line of cases pertaining to assent through continued use of services turn on evidence that the terms were *received* by the party against whom enforcement was sought.[2] See *Comvest*, 234 Ga. App. at 279-280 (2) (affirming the trial court's finding

---

[2] Uber argues that, under the mailbox rule, receipt of the subsequent email it sent to Thornton is presumed. See *American Exp. Travel Related Services Co. v. Berlye*, 202 Ga. App. 358, 360 (2) (414 SE2d 499) (1991). But Georgia courts have

10

that customer was bound to arbitration agreement when issue of fact as to receipt was resolved through some evidence that the terms were mailed and evidence that customer was knowledgeable of industry practices that required submitting disputes to arbitration); *Honig*, 537 F.Supp.2d at 1283 (II) (A) (uncontroverted evidence that cable user received subscriber agreement where the agreement was handed to the user and where the user signed a work order acknowledging receipt).

Here, Uber presented an affidavit from its paralegal, who averred that Uber's records reflect that it sent an email to Thornton on November 22, 2016, informing Thornton that it had updated its terms and conditions, including portions of the arbitration agreement. The email also stated that "if you use our app or other services on or after [November 21, 2016] you're confirming you've read and agree to the updated Terms." Nonetheless, neither the affidavit nor the exhibits provided by Uber list the email address to the which email was sent. In fact, it appears that an email address was redacted from Uber's exhibit showing that an email was sent, which prevents us from verifying that the email address belonged to Thornton. There is also

---

not applied any presumption of delivery or receipt to other forms of communication, such as telegram or email. See, e.g., *Jackson Co. v. Farmers Peanut Co.*, 61 Ga. App. 248, 252 (6 SE2d 428) (1939) (no presumption of delivery to communication by telegram).

11

no record evidence that the email was delivered to Thornton. We thus conclude that a question of material fact remains as to whether Thornton received the subsequent email and assented to the updated terms and conditions.[3] See *Turfgrass Group, Inc. v. Ga. Cold Storage Co.*, 346 Ga. App. 659, 667-668 (816 SE2d 716) (2018) (questions of fact remained as to assent where company presented evidence that it mailed terms and conditions as a routine business practice but presented no evidence that the terms and conditions at issue were mailed to customer); *Governor's Towne Club, Inc. v. Caffrey Const. Co.*, 273 Ga. App. 284, 287 (1) (614 SE2d 892) (2005) (questions of fact remained as to mutual assent where contract terms were emailed to a third party but the evidence did not affirmatively show whether the email was *delivered* to the contracting party).

*Judgment reversed. Miller, P. J., and Mercier, J., concur.*

---

[3] We note that OCGA § 10-12-15 (b) may have some bearing on whether Thornton received the email as a matter of law; however, this issue was not raised in the proceedings below. Id. ("Unless otherwise agreed between a sender and the recipient, an electronic record is received when: (1) It enters an information processing system that the recipient has designated or uses for receiving electronic records or information of the type sent and from which the recipient is able to retrieve the electronic record; and (2) It is in a form capable of being processed by that system"). Further, there was no evidence in the record as to which email address or in what form the email was sent.